## The People v. William Dawell.

*Divorce: Residence: Jurisdiction.* The courts of a state have no jurisdiction to decree a divorce between parties who do not reside therein, but have a permanent domicil in another state.

*Residence: Recitals: Evidence.* The recitals in the record of a divorce case, that the parties are residents of the state where the suit was instituted, do not preclude the showing, in another state, where the divorce comes collaterally in question, that the parties never resided in said first mentioned state, and that the suit was fraudulent and collusive.

*Constitutional law: Jurisdiction of courts: Judgment.* The provision in the constitution of the United States that full faith and credit shall be given in each state to the records and judicial proceedings of every other state, does not preclude an inquiry into the jurisdiction of courts; and if, in fact, the subject matter of a suit was not within the jurisdiction of the state, from which the court derives its authority, its judgment is a nullity, and may be so treated everywhere.

*Divorce.* The subject matter of a divorce suit is the bond of matrimony existing between the parties; and if the parties have no domicil in the state, a divorce which its courts assume to grant, whether deceived or not as to the fact of residence, is absolutely nugatory.

*Heard April 30.   Decided July 10.*

Exceptions from St. Joseph Circuit.

*Dwight May, Attorney General,* for the People.

*Mason & Melendy,* for the defendant.

COOLEY, J.

This defendant has been convicted of bigamy, and now, upon exceptions, asks that the verdict be set aside. Both the marriages were admitted. The first took place in 1857; the second was to one Minnie Kopp, in August, 1871, while the first wife was still living. The defense was, that before the second marriage the defendant had been divorced from his first wife, on her application. To establish this, he gave in evidence a copy of the record of a proceeding in the court of common pleas of Noble county, Indiana, which contained: 1. What purported to be a complaint of Mary, the first wife, against the defendant, presented at the October term, 1870, averring her residence in Noble county; charging defendant with refusal to speak with or treat her as a wife, and finally with refusal to cohabit with her, and with abandonment, and praying for a divorce; 2. An authority from the defendant to one Goodwin, an attorney of Noble county, "to appear for me in any court of record of said county, and answer for me, and waive process that my wife, Mary Dawell, may procure a bill of divorce;" 3. An answer by Goodwin, on behalf of defendant, admitting the wife's residence in Noble county, but denying all the other allegations of the complaint; 4. A judgment of the court, rendered on the third day of the same October term, purporting to be based on evidence, and declaring the marriage dissolved.

This expeditious proceeding, in which the defendant, in voluntarily appearing, declares his purpose to be to enable his wife to obtain a divorce, bears upon its face such evidence of collusion as, in this state, would justify the setting aside of the decree, whenever attention should be called to the facts; and we do not doubt that such would be the case in Indiana also, for the supreme court of that state

has very carefully laid down the doctrine that divorces by collusion are not to be suffered to stand.—*Scott v. Scott, 17 Ind., 309.* But until the degree should be set aside or reversed by the action of a competent court, it could not be treated as void on the ground here indicated.

The prosecution claimed on the trial that the whole proceeding was void for want of jurisdiction; that the courts of Indiana never had any authority to decree a divorce between the parties, and that the decree in the case was procured by a fraud upon the law and deception practiced upon the court. To establish this they introduced evidence tending to show that the said Mary Dawell and William Dawell, mentioned in said record, were, during the whole of the year 1870, residents of the county of St. Joseph, and state of Michigan, and that they had resided, and still continued to reside, in said county of St. Joseph, in the same house, for more than two years preceding the time of trial (January 25, 1872), and never resided in the state of Indiana, and that during that time the said Minnie Kopp had resided with them. The prosecution then introduced the said Goodwin as a witness, who testified as follows: "I resided at Kendallville, Indiana, in October, 1870; am by profession an attorney at law." Being then shown the Noble county record, he proceeded: "I have knowledge of this case. I appeared for the defendant, William Dawell, in said court. I had what purported to be authority to appear for him; handed me by Mr. J. B. Wade, attorney for plaintiff in said proceeding. I have before me the original authority. It is in writing. I think I know Mr. Wade's handwriting. I have seen him write. The body of this is in Mr. Wade's handwriting; the signature is that of some other person. I find the record to contain a true copy of the original authority handed me by Mr. Wade. I filed the paper with the clerk of said court.

25 MICH.—32.

of common pleas of Noble county, in said cause. I drew an answer for said defendant in said cause, at the request of said J. B. Wade, and caused it to be filed. I met Mr. Wade at Albion; he said he had a divorce case in court there, and showed me this authority for me to appear; I received it; Mr. Wade and the judge were conversing about the matter; Mr. Wade asked me to make certain admissions as to residence of the plaintiff; he told me the parties lived near Wolcottville, in Noble county, Indiana, and had for the last two or three years. I did so, and waived service of process in the answer, at Wade's request. I never saw the defendant in that, nor until here in court in this case. I received no compensation except the thanks of Mr. Wade."

Upon this evidence the counsel for the defendant made several requests for instructions to the jury, the substance of which was, that the record of divorce in Noble county was a complete protection to the defendant in this prosecution, even though the divorce may have been obtained by fraud, either in giving the court jurisdiction or in proving the allegations of the petition; that the question of fraud cannot be raised except by the parties to the record, and consequently cannot be gone into in this proceeding; and, if it could be, no evidence has been given in the case, having a tendency to establish it. The court declined these requests, and charged the jury as follows:

"1. The defendant in open court having admitted his first marriage to Mary Dawell, and afterwards his second marriage, in this county, to Minnie Kopp, his former wife being then still alive, as charged in the information against him, and evidence having also been offered before you to show that the said Mary Dawell and the said defendant were, at the time of said last marriage, and for a year or more next preceding had been, residents of this county of St. Joseph,

which is not controverted by the said defendant, the charge of polygamy, alleged in the information, is *prima facie* made out against the defendant, and the burden of proof is upon him to show that prior to his said second marriage he had been legally divorced from said Mary Dawell, or to show some other legal excuse or justification under the statute.

"2. If you find from the evidence that at the time the alleged proceedings for a divorce were instituted, and a decree of divorce obtained in the court of common pleas of Noble county, Indiana, introduced in evidence on behalf of the respondent in this case, the said Mary Dawell and the respondent were each of them actual residents of this state, and had been for a year or more immediately preceding the time of instituting the said proceedings, and the obtaining of the said decree, and were neither of them at the time residents of the state of Indiana, then the said decree of divorce is no defense to this prosecution.

"3. If you find from the evidence that the said first wife, Mary Dawell, and the said defendant, at the time the said proceedings were instituted, and the said decree of divorce obtained, in the court of common pleas of Noble county, Indiana, were neither of them residents of said state of Indiana, but were residents of this state, and that said proceedings were commenced by agreement or collusion between the said parties, in this state, to obtain a divorce in the state of Indiana, then such decree is no defense in this prosecution.

"4. If you find from the evidence that said proceedings for a divorce in the court of common pleas of Noble county, Indiana, were instituted by the said defendant in this case, William Dawell, without the knowledge or consent of his said first wife, Mary Dawell, and that she never actually appeared in the case, and never authorized any one to

appear for her in said proceeding, then said decree is no defense to this action.

"5. If you find that either of the parties was a resident of Indiana at the time said proceedings were instituted and said decree of divorce obtained, and that both parties voluntarily appeared in the said suit, or authorized their appearance to be entered therein, then said decree is a perfect defense to this action."

The defendant insists that all these charges, except the last, were erroneous, and it is upon exceptions to these, and to the admission of the evidence upon which they were based, that we are now to review the trial.

It is worthy of notice at the outset that neither the first wife nor the attorney who nominally appeared for her in the state of Indiana, was made a witness on the trial. It was not in the power of the prosecution to make a witness of the first wife, except with defendant's assent; but he was at liberty under our statutes to call her if he saw fit to do so. Neither could the prosecution take the testimony of the attorney, by commission; but the defendant might have done so, if he supposed that any facts within his knowledge would be of service to the defense. These facts may be of no importance to the decision of this cause, but they are not to be overlooked when we come to consider the consequences to which the doctrines maintained on behalf of the defense must lead. The decree of divorce under consideration was obtained either by fraudulent collusion between the parties, or, if not by collusion, then the husband must have caused the complaint to be filed in the wife's name, and practiced a fraud upon her, as well as upon the law and the court. The appearance of the record, as I have already said, indicates collusion; but it is a most significant circumstance, that the only party who, by the evidence, is shown in any manner to have had any thing to do with

the case, is the defendant himself, who was the accused party. If the authority to appear for him was genuine, as we must presume it to have been, since the defendant relies upon it, he appears to have been a party willing, anxious, and eager to have his own turpitude established immediately; he waives service of process, and the proceeding is accelerated in a manner wholly unknown to, and inadmissible under, the laws of this state. The attorney who nominally acts for the plaintiff, in fact, is shown to be acting for the defendant, to the extent, at the least, of drafting an authority to appear, and of securing an attorney to put in a sham defense, the principal purpose of which seems to have been falsely to admit the facts giving the court jurisdiction. From the evidence all the inferences are against the wife having ever had any thing whatever to do with the case; her mouth is closed; she can not tell her own story, and the prosecution can not compel the attorney who nominally acted for her, to tell his, though the defendant might have done so. We can not know, therefore, whether the wife was aware of the filing of the complaint in her name or not, unless the defendant sees fit to open to us the sources of information; but, as we catch not a single glimpse of her as an actor in the transaction anywhere, and the attorney nominally appearing for her is shown to have been really acting for the husband, it is not a violent presumption, that the wife may have been ignorant of the whole proceeding, and that, in its inception, in the employment of counsel, in the false admission of facts, and in its conclusion, it was an unmitigated outrage upon her rights, perpetrated under the husband's direction and at his expense, for the gratification of his own desires.

But I do not propose to consider very particularly the special facts of this case, but rather to examine the principle that underlies them, in order to determine, if possible,

how far the defendant is correct in his position, that the divorce, notwithstanding its fraudulent character, is a complete defense in this proceeding.    This question, as it appears to me, is one of the most serious and important which we ever have had occasion to consider; and it vitally concerns the good order and reputation of the state, and the morals of its people.    In its essence it is no more or less than this: Does the state of Michigan establish and control the domestic relations of its own citizens, or do they exist and continue only at the discretion of the inferior courts of another state ?

In considering this subject I do not have occasion to call in question the wisdom of the divorce laws of our sister state, or the justice or propriety with which those laws have been administered by the supreme judicial tribunal of that state.    The decisions of that tribunal have, in the main, I think, been wise and sound, and such as we all concur in; but it is a fact, which I think I may justly say is well known and understood, that in the inferior tribunals of that state, divorces are obtained with more facility than in the circuit courts of Michigan, and that, in consequence, married persons in this state, discontented in their relations, or smitten with a new passion, but having no good cause for divorce, have frequently, and sometimes under very outrageous circumstances, resorted to Indiana, and obtained a decree purporting to dissolve their marriage relations.

Now I understand the rule to be, that to give the courts of any state jurisdiction over the marriage relation between a husband and his wife, one of the parties, at least, must have a domicil within that state.    Some of the judicial decisions make further requirements; but no court has ever held that any less could be demanded.    It is, then, and must be, admitted on all hands, that while these

parties had their residence within this state, the courts of Indiana had no authority to consider the question of divorcing them. That was a matter which pertained exclusively to the authorities of this state. Our legislation forbids plural marriages, but establishes exceedingly liberal regulations for divorce, under which parties who are wronged in their marriage relations, are enabled to have them severed, on showing cause. But we do not think it conducive to good morals, or public decency, that married parties should be allowed to change spouses at discretion, or that a husband who had tired of his wife, whose charms perhaps had faded in the bearing and nursing of his children, should be at liberty at any time, by going through some formal proceeding in court, to turn her out of his doors, that he might supplant her with some fresher beauty. All our legislation has been framed in the belief that the marriage tie should be indissoluble, except upon cause shown; and of the sufficiency of this cause the parties themselves are not allowed to be the judges. This is the view that obtains in this state. It may be right, or it may be wrong. There have been those within the limits of the state who thought polygamy proper, and others who have believed that marriage should be only during the good pleasure of the parties; but the prevailing sentiment has condemned these notions as licentious and demoralizing, and has forbidden, under severe penalties, their practical realization within this state. If other states or countries hold different opinions, they can embody them in their own legislation, if they see fit; but it will be conceded that they have no right to invade our jurisdiction to right any wrongs which they may suppose to exist in our laws upon this subject.

It is clear, then, that the court in Indiana had no authority to decree a divorce between these parties. Any

·wrong against the marriage relation between them, con-
·cerned this state, and not that; and was inquirable into
by the courts of Michigan, and not by those of Indiana.
But if the decree was granted without authority, why is
it not absolutely and for all purposes void?

To. this it is replied, that the record shows a finding
by the Indiana court that the parties resided in that state,
and that this finding is conclusive upon the question of
jurisdiction, except on motion in the same court to vacate
the decree. That doctrine brings us to this: That
although the Indiana court had no jurisdiction to divorce
two of our citizens, yet, having assumed to do so, on the
false statement of one or both of the parties, that they
resided in Indiana, the decree is absolutely binding, unless
the court sees fit to vacate it. In other words, the marriage
relation between two of our citizens depends upon the dis-
cretion of a foreign court, which by law has no concern with
it whatever. Such a doctrine is not only monstrous in its
results, but it has, as I conceive, no support whatever in
authority. It has been held invariably, that a foreign
judgment is open to be assailed by evidence showing a
want of jurisdiction. The only question in dispute has
been, whether the recitals in the record of the appearance
of the parties could be disproved for this purpose,—some
cases holding that they could, others that, in the case of
a judgment of a sister state, they could not. That partic-
ular question, as an abstract one, I do not discuss, because
I conceive there is a difference between disproving recitals
of jurisdiction of the parties and jurisdiction of the subject
matter in divorce cases, which is the point involved here.
If this might not be disproved, a party seeking a divorce
need only apply for it in some distant country, and find
suitable tools to aid his fraud, and the difficulty and
expense attending a proceeding to exhibit the facts to the

satisfaction of the same court would, in most cases, be so great as absolutely to preclude the attempt. Thus it would be easy to give to the courts of any country whose jurisprudence we recognize as that of a civilized people, the power to divorce one of our citizens, under circumstances of wrong and outrage upon the other party, and yet no practicable remedy be open to the party wronged. And even if a practicable remedy were open to the party, if he should see fit not to pursue it, there would be none whatever for the state among whose citizens disorder and license would thus be introduced.

But it is said that if the parties appear in the case, the the question of jurisdiction is precluded. That might be so if the matter of divorce was one of private concern exclusively. But such is not the case under our laws, nor will it ever be until it comes to be understood that parties have the right to marry and unmarry at pleasure, and that if they choose to trade spouses, it is the concern of nobody but themselves. Such an understanding would require a considerable change in the existing laws of this state. As those laws now are, there are three parties to every divorce proceeding; the husband, the wife, and the state; the first two parties representing their respective interests as individuals; the state concerned to guard the morals of its citizens, by taking care that neither by collusion nor otherwise, shall divorce be allowed under such circumstances as to reduce marriage to a mere temporary arrangement of conscience or passion. The state of Indiana has recognized this fact, in requiring an appearance in divorce suits by a public officer, whose duty it should be to see that a legal case was established (*2 Rev. Stat.*, *p. 238*); and though we have no similar statutory requirement in this state, we have always recognized the principle, and the court has considered it its duty to inquire specially into collusion in

25 мюн.—33.

every case, and to deny a divorce wherever collusion appeared, even though a satisfactory case might seem to have been *prima facie* established. Such being the case, suppose we admit that the parties to the marriage may be bound by their voluntary appearance in the foreign jurisdiction; how does that affect the present case? How and in what manner did the Indiana court obtain jurisdiction of the third party entitled to be heard in this proceeding; that is to say, of the state of Michigan? Has this state ever, directly or indirectly, consented that a matter of high interest to itself, and no way concerning the people of Indiana, shall be tried by the tribunals of the latter state? Has it ever waived its right to govern the domestic relations of its own citizens, and consented that an inferior judicial officer of another state, in whose choice its electors have not been consulted, may exercise over them, with or without the consent of parties, a power of final control? Those who insist upon the validity and binding force of this decree, should be able to point out how and in what manner, by what written or oral consent, or through what neglect or default, this third party has lost its right to have its own concerns passed upon by its own courts, or has handed them over to a foreign authority. Nothing in this record shows such consent or such waiver, even if it were competent for the state to give it; all that appears here is, falsehood and fraud, practiced and employed upon the tribunals of another state, in order to induce them to take cognizance of a controversy which belongs to the tribunals of this state; but which, for some unexplained reason, certainly not an honest one, the parties, or the acting one of them, are unwilling to submit to the proper court.

This third party, therefore, not having consented to the proceedings, expressly or impliedly, and the foreign tribunal having confessedly no authority over the subject mat-

ter, unless it could obtain it by consent, there would seem to be very little more to be said upon this case. As to the state, at least, the divorce must be void; and the state has very properly treated it as void, by instituting this prosecution. And the state has obviously no other remedy for the wrong done it; for, as a state, it cannot appear in the foreign court to ask that the fraudulent divorce be vacated.

It is insisted, however, with great earnestness, that whatever might have been the case otherwise, the provision in the constitution of the United States, that full faith and credit shall be given in each state, to the public acts, records, and judicial proceedings of every other state (*Const. of U. S., Art. IV.,* § *1*), will preclude our inquiry into the validity of this divorce. If that provision of the constitution could be so construed as to protect and make valid a fraudulent proceeding like the one in question, it would certainly be a most singular perversion of its original purpose. The provision itself was eminently wise and proper. It had for its object to prevent any such weakening of the bonds of the Federal Union, as might follow from the states disregarding what was due to courtesy and comity when their respective proceedings should come under consideration, and opening anew the controversies and questions, which, in the jurisdiction having properly and primarily the control of them, had once been determined. Its whole purpose and aim was in the direction of justice, comity, and good neighborhood between the states; and it would be most remarkable if it could now be employed to bolster up a proceeding where a court of one state has interfered in a matter which wholly pertains to the concerns of another state; which is within the exclusive jurisdiction of such other state, and relates to its citizens exclusively; which it is impertinent for such court, in any

manner, to meddle with, and which justice, as well as every principle of comity, requires such court to let alone. If the constitutional provision can be so employed, then I do not hesitate to say, that it is capable of accomplishing more evils than it has the power to prevent, and that, too, in the very direction in which its good influences were anticipated. For the effect is, to destroy inter-state comity, and good neighborhood, by enabling one state to extend its laws and legal procedure into the domain of its neighbor; to subject the citizens of such neighbor to its own control in their most important relation of life, and to introduce among them practices which their own laws regard as, in a very high degree, vicious and demoralizing. What could possibly tend, in a greater degree, to destroy the good feeling existing between the people of Michigan and the people of Indiana, as citizens of one common country, than to have it understood, that the courts of the latter state were in the practice of divorcing the citizens of the former at discretion, in entire disregard of the local law, and of all the rules which have been established here in the interest of good morals and public justice? Can the people of Michigan regard a case like the one before us, as any thing else than a wrong to their jurisdiction, and an invasion of the sovereign rights of the state, and will not their attachment to the federal constitution be weakened if they are to be told that such things are to be protected, and the guilty parties shielded under its provisions; or, at least, that it precludes any other remedy than one which rests in the discretion of an officer who resides beyond the limits of the state to which the parties are amenable, to whom it will be only at much expense and with much difficulty, that the proper application and showing for redress can generally be made, and who, when reached, has no power whatever to punish the guilty parties, but

can only, at most, if he shall see fit to do so, deprive them of the expected fruits of their misconduct?

But I do not concede that the federal constitution will properly admit of any such construction. That instrument is not one to be construed technically; it was meant to subserve great and beneficial ends; and any narrow and technical construction that makes it defeat those ends, and work mischief, is obviously a perversion of its real meaning. The provision in question was not designed to make good a judgment rendered without jurisdiction; its object was, so far as judgments are concerned, to preclude their being disregarded in other states, when a proper tribunal, with competent jurisdiction, had rendered them. Many decisions of the federal courts were cited on the argument for the defense, but none of them holds that a void judgment is validated by this provision. The most of them were cases of money demands, or suits for property, where only the parties to the record were concerned, and the rights and sovereignty of another state were in no way involved. They presented the question generally, whether the defendant had been properly brought in; and they have very little analogy to a case of divorce, where the state, the third party concerned, neither does nor can appear abroad, and where the defendant can easily contrive to be the sole actor, as he probably was in this case, and may possibly bring the proceedings to the knowledge of the wife for the first time when, armed with the decree of the foreign court, he notifies her to leave his bed and board to make room for a new comer. The case most relied upon is, *Cheever v. Wilson, 9 Wal., 108,* but I discover nothing in it that can benefit the defendant. It does not appear to have been disputed there, that the complainant had a nominal residence in the jurisdiction where the divorce was rendered, but it was claimed that it

was colorable merely. The court, without deciding whether the finding of the residence by the record could be disproved, held that no adequate testimony had been introduced for the purpose. The point here involved was, therefore, expressly left undecided. Moreover, nothing was involved in that case but property rights; and as it was clear that both parties appeared and were actors in the divorce proceedings, they and their privies might very properly be held precluded from attacking the decree, so far as it affected such rights, by a suggestion of their own fraud. Obviously, that would be a very different thing from holding that a state, upon whose laws a fraud has been practiced, is precluded from showing the fact, by a false recital in the record of a distant court, which recital was procured to be made by the same fraud.

Our attention has also been called to the recent case of *Kinnier v. Kinnier, 45 N. Y., 535,* which is supposed to overrule a considerable number of former New York cases decided in harmony with the views I have here expressed. If it does overrule them, it is opposed to a very great weight of American authority, and I refer to the following cases in support of this opinion: *Barber v. Root, 10 Mass., 260; Hanover v. Turner, 14 Mass., 227; Lyon v. Lyon, 2 Gray, 367; Chase v. Chase, 6 Gray, 157; Smith v. Smith, 13 Gray, 209; Shannon v. Shannon, 4 Allen, 134; Leith v. Leith, 39 N. H., 20; Pawling v. Bird's Ex'rs., 13 Johns., 192; Borden v. Fitch, 15 Johns., 121; Vischer v. Vischer, 12 Barb., 640; McGiffert v. McGiffert, 31 Barb., 69; Kerr v. Kerr, 41 N. Y., 272; Todd v. Kerr, 42 Barb., 317.* And see *Maguire v. Maguire, 7 Dana, 181; Ditson v. Ditson, 4 R. I., 87; Smith v. Smith, 4 Greene, Iowa, 271; Thompson v. State, 28 Ala., 12; Parish v. Parish, 32 Ga., 653.*

But in terms it overrules only the case of *Jackson*

*v. Jackson, 1 Johns., 424,* in which the court held that the wife could not acquire a domicil separate from her husband—in which I agree that it erred—and also that the parties were not bound by a decree for alimony made between them in a case in which they had voluntarily appeared in another state,—in which particular it is, perhaps, opposed to *Cheever v. Wilson,* above cited. In this regard I have no occasion to question in the least, the case of *Kinnier v. Kinnier.* But some of the language of that case does not appear to me to have been weighed and considered with the attention which important cases usually receive in that learned court. The question arose upon demurrer to a complaint filed by one who had married a woman whose previous husband, it was alleged, had procured a divorce from her by collusion, in a state distant from that in which they resided. The purpose was to annul the second marriage. The complaint alleged that the first husband went to such distant state, in order to procure a divorce for a cause which would not be recognized in the state of his residence, and in order to evade the laws of that state; that the wife followed him, and by collusion the divorce was procured. The court held that this complaint did not show the divorce to have been invalid. It is said *(p. 539):* "The court had jurisdiction of the subject matter of the action; that is, it had jurisdiction to decree divorces according to the laws of that state; and every state has a right to determine for itself the ground upon which it will dissolve the marriage relation of those within its jurisdiction. The court had also jurisdiction of the parties by the voluntary appearance of the defendant." With great respect, it appears to me there are several misconceptions in this statement. The "subject matter of the action" was not the question of divorce in general, but was the marriage relation between

the very parties to that suit; and that subject matter neither was, nor could be, within the jurisdiction of the court, if the parties had no domicil within the state from which the court derived its powers; for the obvious reason that the state itself having no jurisdiction over the marriage relation between such parties, could confer none upon its courts.   Furthermore, it is not true, that "every state has a right to determine for itself the ground upon which it will dissolve the marriage relation of those within its jurisdiction," if by this is included those who are only in person within its limits, but have their residence elsewhere. Will it be seriously claimed that any state might enact a law that citizens of other states might be divorced at pleasure in its courts, by simply applying in person for the decree?   Would not every other state be likely to protest, with emphasis and indignation, that any such law was an invasion of their sovereignty, and an attempt, by indirect methods, to control the domestic relations of their citizens? But if such a law could not be valid, how can it be truly said, that a court, whose authority cannot possibly be broader than that of the state which created it, had "jurisdiction of the parties by the voluntary appearance of the defendant," when such voluntary appearance could no more bring the subject matter of the suit within the jurisdiction of the court, than in ejectment it could bring the land from a distant state, and enable the court to pass upon the right to its possession.   The fallacy which runs through this New York decision, though not distinctly expressed, is, that divorce is a matter which concerns the parties only, and consequently they may carry the cause of action with them wherever they go, notwithstanding their domicil may remain unchanged.   This fallacy, I trust, is sufficiently exposed in what has already been said.

The subject matter of a divorce suit is just as much

local as the subject matter of a suit in ejectment. It is the *status* of the parties, permitted, regulated and controlled by the law of their domicil, which is to be passed upon and determined; and the appearance of the parties in a foreign jurisdiction does nothing whatever towards transferring this subject matter. It can not by any possibility be brought under the cognizance of a foreign court; and it is nothing less than an absurdity to ask of us to recognize and give effect to a decree of divorce granted abroad, by a court without authority, in evasion of our laws, and in fraud or contempt of our jurisdiction. To permit one of our own citizens who had obtained a decree of divorce abroad, to turn his wife out of doors in this state under it, would be scarcely less preposterous than to suffer a writ of possession to be executed in this state on a judgment in ejectment rendered abroad. If, however, the absurdity of the case were its worst feature, the public would be less concerned with it than they are now; but we can not shut our eyes to the fact, that these divorces are always fraudulent, are often obtained by perjury, in many cases are had secretly, and without any suspicion on the part of one party that such a proceeding is being taken, and that they tend, in defiance of our laws, to make marriage a mere provisional arrangement, which the parties may break up at will. Moreover, the foreign court has no power to make such provision for the wife and children as, in many cases, would be necessary to prevent their being thrown upon the charities of the world, and if it had, it would generally be kept in ignorance of the facts, and therefore incompetent to make such provision. Such circumstances are not exceptional; when residents of our state find its liberal divorce laws insufficient for their purposes, and resort to a foreign jurisdiction, it is generally because they seek to accomplish something which no court, fully possessed

25 MICH.—34.

of the facts, could honestly grant, and to which, consequently, deception and fraud are essential, and in general, perjury also.

I think the exceptions are not well taken, and that the circuit court should be advised to proceed to judgment.

CHRISTIANCY, CH. J., concurred.

CAMPBELL, J.

Defendant was indicted for bigamy.    There was no dispute concerning the fact of his having been married twice, both wives being living.    But a divorce was granted in a suit brought against him in Indiana by his first wife, and the effect of that divorce is the only important question in the cause.

The Indiana proceedings appear to have been regularly begun in the name of the first wife, by a petition filed in due form, containing all the averments of residence, marriage, and other facts necessary to authorize relief to be granted. Defendant appeared by attorney, and upon a hearing the divorce was granted in accordance · with the statutes of Indiana.

On the trial of the present criminal case, this divorce was assailed on the grounds, that the Indiana bill was filed without authority from the complainant therein, and that both parties were residents of Michigan, and the Indiana proceedings were collusive and fraudulent.

The complaint in Indiana was not signed by the complainant, and was not verified by her.    The effect of the decree, if valid, was to operate directly upon her marital position and rights.    While it is not very common for any but a defendant to object to a judgment for want of jurisdiction, this is because it is not very common for suits to be brought without the act and consent of the plaintiff or

complainant, who submits to the jurisdiction of every court in which relief is sought by such authority, and cannot object to be judged by a tribunal whose interference has been applied for. But a court can bind no one over whom it has obtained no jurisdiction, whether plaintiff or defendant; and a suit brought in the name of a party who never authorized it, is no more his suit, than the unauthorized pleading put in on behalf of a defendant who has not been served with process, and who has employed no attorney, can be called his defense, so as to subject him to the jurisdiction, and bind him by the judgment.

If it is open to a defendant not served with process, to assail the judgment of a court of another state, by showing that the appearance entered in his name was unauthorized, there is no reason why a supposed complainant, whose name has been used without authority, should not, on the same principle, attack the jurisdiction as unlawfully exercised. A plaintiff is quite as liable as a defendant, to be damnified by a judgment obtained in the interest, and by the contrivance, of the adverse party.

It was held by the supreme court of the United States, in *Shelton v. Tiffin, 6 How. R., 163,* that where the record showed no personal service or appearance, and the only way in which a party was brought before the court was by the action of counsel who appeared and waived process, the party for whom they purported to act might show the want of authority, and thus defeat the judgment. While it is. universally conceded that the appearance of counsel is presumptively authorized, it is there held not to be conclusively binding. As the doctrine thus decided has not been overruled or doubted, we think it disposes of the question as to both parties in the divorce suit. There seems to have been no doubt of the husband's being represented by his

·own consent. But I think it was proper to inquire into the authority purporting to come from the wife.

The evidence ·presented on the trial did not show whether the suit in Indiana was authorized or not by the wife.· It showed almost conclusively that, if she did authorize it, there was some understanding between the parties that the case should be disposed of without any question being raised as to the real residence of either of them, and the finding of the jury, as to this latter point, was authorized by the testimony. Its effect becomes important in consid·ering what seems to be regarded as the chief matter in ·controversy.

The question thus presented is, whether a judgment ren·dered by a court of another state on pleadings which, if proved, gave full authority to pronounce judgment, and where the parties both submitted themselves to the jurisdiction, can be assailed. collaterally, by denying the truth of any of the matters which the court was required to pass upon as necessary to justify the judgment rendered by it.

If Mrs. Dawell was a *bona fide* resident of Indiana for the time required by the laws of that state, and the suit was brought by her authority, the divorce was undoubtedly valid. The question is, whether evidence can now be given to show she was not a resident of Indiana, in order to defeat the decree.

There is no ground for making any distinction between the various classes of "judicial proceedings" to which "full faith and credit" must be given under *Article IV., section 1,* of the constitution of the United States. It has never been denied that divorce cases were embraced under this provision. And no court has deemed itself at liberty to review a divorce granted in another state, on the general merits, any more than any other judgment.

The constitutional provision was held applicable in. *Chever v. Wilson, 9 Wallace, 108,* as it has been generally by the state courts, and as it must be, unless an exception is imported into the constitution, which the framers of it did not see fit to insert. This has been held in those states where the inquiry into jurisdiction in such cases has been extended furthest.—*Barber v. Root, 10 Mass., 262 ; Kinnier v. Kinnier, 45 N. Y., 535.*

The earlier cases in Massachusetts, and New York, held all judgments in sister states to be assailable, on many grounds not open to question now, under any of the decisions. Since the effect of such judgments was settled in *Mills v. Duryee, 7 Cranch R., 481,* they are held entitled to the same faith and credit in every other state, that they are entitled to at home.

It was held in *D'Arcy v. Ketchum, 11 How. R., 175,* that no judgment was protected under that clause of the constitution, where the defendant had not been brought before the court by process or appearance. And in all cases where judgments are sought to be maintained on substituted service, so as to operate as judgments *in rem,* the law has always required the strictest proof of jurisdiction. There has been some difference in regard to divorces obtained without appearance or service of process—some states refusing to recognize divorces against their citizens, granted by other states where the adverse party was domiciled, and some admitting their validity, where there was such a foreign domicil, in fact, and not sought merely for temporary and fraudulent purposes. There are many cases holding such divorces void, where there has. been actual fraud, if the defendant in the divorce suit was never reached personally, and never appeared.—*Hanover v. Turner, 14 Mass. R., 229 ; Lyon v. Lyon, 2 Gray, 368 ; Kerr v. Kerr, 41 N. Y., 272.*

But where a court has jurisdiction over such a case as

is presented by the pleadings, and the parties appear, the judgment must, on every sound principle, be held conclusive.    There is no more reason for allowing one class of alleged facts to be disputed, any more than another, and so long as the judgment stands unreversed, and not set aside, or stayed, it must be regarded as of full force, and is no more assailable for one reason than for another.   It binds the parties, and it settles all rights which they could litigate anywhere, whether they have acted in good faith or not· Undoubtedly, there are many cases where mischief results from giving judgments this full credit, but they are as often to be found in domestic, as in foreign judgments. And if the door is opened at all, every party who has obtained a judgment, must be at the hazard of losing the fruits of it, unless he can be prepared, at all times, to prove his case over again, whenever his adversary sees fit to trump up a defense of fraud.    Such a state of things would be intolerable.    The law must always presume, that when parties are actually represented before a court of justice, the court will do its duty, and the prevailing party will prevail on sufficient grounds.

Accordingly, the doctrine is settled by authority, which is binding, that if the court has jurisdiction over the case as presented by the issue, and the parties appear, there is no ground on which a judgment can be lawfully disregarded, and that fraud is no more admissible than any other ground, to assail a judgment, unless in a direct proceeding to have it annulled.—*Christmas v. Russell, 5 Wallace R., 290 ; Hatcher v. Rocheleau, 18 N. Y., 86 ; Wilcox v. Kassick, 2 Mich. R., 165 ; Granger v. Clark, 22 Maine, 128 ; Anderson v. Anderson, 8 Ohio R., 108 ; Benton v. Burgot, 10 S. & R., 240 ; Homer v. Fish, 1 Pick. R., 435 ; McRae v. Mattoon, 13 Pick. R., 53 ; Nations v. Johnson, 24 How., 203 ; B. & W. R. R. Co. v. Sparhawk, 1 Allen, 448 ;*

*Hammond v. Wilder*, *25 Vt.*, *346* ; *Embury v. Conner*, *3 Comst.*, *511* ; *Hollister v. Abbott*, *11 Foster*, *448* ; *Wall v. Wall*, *28 Miss.*, *413* ; *Wheeler v. Raymond*, *8 Cow. R.*, *311* ; *Grignons' lessee v. Astor*, *2 How.*, *319* ; *Palmer v. Oakley*, *2 Doug.*, *433* ; *Hopkins v. Lee*, *6 Wheat.*, *109* ; *Shumway v. Stillman*, *6 Wend.*, *447* ; *Cooper v. Cooper*, *7 Ham.*, *238*.

The law will not suffer an absent party to be prejudiced without an opportunity to be heard, and where there has been no personal service or appearance, there is no hardship in holding to the utmost strictness in complying with all requirements. But when parties appear, it must be presumed they will look after their rights, and, having had the opportunity to do so, any judgment regularly obtained must stand as binding them both. There are many cases where the right to implead parties depends on residence, or on some other peculiar qualification, but no authority will permit a judgment to be impeached, on the ground of any want of such qualification. No court of the United States, for example, had any jurisdiction over ordinary controversies between citizens of the same state, or between any but aliens and citizens, or citizens of different states, and a judgment will be reversed on error, where the jurisdictional facts are not averred.—*Jackson v. Ashton, 8 Pet. R.*, *148*. But the question of citizenship cannot be raised in any collateral proceeding, or in any way, except by a regular objection in the ordinary course.—*Erwin v. Lowry*, *7 How.*, *172* ; *Wickliffe v. Owings*, *17 How.*, *47*.

A citizen of another state cannot be bound to regard state insolvent proceedings, but if he appears, and makes himself a party to them, he is bound as fully as if he had been a citizen of the same state.—*Clay v. Smith*, *3 Peters*, *411*. So, where none but "traders" are subject to such laws, and there is an adjudication, that concludes all further inquiry.—*Vanquelin v. Bouard*, *15 C. B. (N. S.)*,

*341.* The principle is one of general application, as to all matters which parties appearing have a right to litigate in the cause. See cases above cited, and *Rathbone v. Terry, 1 R. I., 77; Wall v. Wall, 28 Miss., 413; Henderson v. Henderson, 11 Q. B., 1015.* The cases of *Harrod v. Barretto, 2 Hall R., 302,* and *Aldrich v. Kinney, 4 Conn. R., 380,* indicate clearly the reasons why a distinction is taken between the right to inquire into the authority of an attorney, and the right to inquire into other facts. The attorney's authority in no way enters into the actual consideration of a court, and is not passed upon, but all facts bearing upon the right of the court to grant relief as asked, enter into the *res adjudicatas,* and any subsequent inquiry into them, is an opening and re-hearing of so much of the cause itself.

We are bound to apply to such cases the same rules which we would apply to judgments and decrees passed by our own courts. And it would certainly be a novelty if a divorce, regular on its face, and granted by one of our own courts, could be attacked collaterally, by denying the residence of the parties averred in the proceedings. The law of Indiana now requires the courts to look vigilantly after the rights of all parties in divorce cases, and does not permit the residence to be proved, as formerly, by an *ex parte* showing.—*Scott v. Scott, 17 Ind., 309; Jenness v. Jenness, 24 Ind., 355.* It is quite as stringent as our own law, in all jurisdictional and substantial requirements, and the cause of action, in the divorce suit before us, is the same under the laws of both states. If there is any difficulty in the matter, it arises out of carelessness in the administration of the law, which, while a source of scandal, does not deprive a judgment of its constitutional and legal force, and will not permit us to disregard it.

It cannot well be questioned, that if this decree binds both

parties, it of necessity dissolved the marriage. A marriage cannot exist for one purpose, and be void as to another. It was held in *Kinnier v. Kinnier*, *45 N. Y., 535*, that a subsequent marriage could not be annulled, by showing fraud and collusion in obtaining the divorce, but that if it bound the parties, they were no longer married, and a marriage thereafter must be valid.

We have no statute punishing parties for the offense of leaving the state, or resorting to foreign tribunals, for the purpose of obtaining divorces, as they have in Massachusetts, and our statutes render it lawful for all persons to marry whose former marriage shall have been dissolved.— *2 Comp. L.,* § *3208*. In the absence of any legislative policy to the contrary, there seems to be no method of reaching foreign divorces where both parties have appeared, without opening a door to impeach any judgment of a sister state, by denying facts adjudicated. And the consequences to innocent parties who have married divorced persons, are too serious to render any such course proper as an exceptional one. It is possible, by legislation, to punish any class of frauds, criminally, but it is not proper, in order to punish parties, although they may very richly deserve it, to disregard the elementary principles of jurisprudence.

I think the court below erred in its rulings, and that there should be a new trial.

GRAVES, J., did not sit in this case.