ADEL LOUISE WATKINSON

v.

HOWARD WATKINSON.

[Submitted March 21st, 1904. Decided March 29th, 1904. Filed December 23d, 1904.]

1. A decree of divorce, made in a cause where the defendant was not within the territorial jurisdiction of the court, and was not served with process and did not appear, and the complainant had no domicile within the territorial jurisdiction, is absolutely void and incapable of being ratified by the acquiescence of the defendant.

2. A decree of divorce against a defendant wife, who does not reside within the jurisdiction and who does not appear, based upon her adultery, which had been fully and completely condoned by the husband, but which condonement was concealed from the master, will be set aside on a bill of review by the wife.

3. A delay of about four years in bringing a bill to review a decree of divorce held not to be fatal where the wife was poor, in ill health and ignorant of her rights, and no copy of the decree had been served upon her or other positive information brought home to her until more than a year after the decree was entered.

Mr. James Steen and Mr. William D. Tyndall, for the petitioner.

Mr. John H. Backes and Mr. Willis P. Bainbridge, for the defendant.

PITNEY, V. C.

This is a bill of review filed by Adel Louise Watkinson against her husband, Howard E. Watkinson, to review and set aside a decree of divorce obtained by said Howard against her in this court on the 11th of December, 1896, and filed on the 17th of December, 1896.

The ground of the decree was adultery with one Rebholz.

That decree is attacked by the present bill on two grounds:

*First.* That after the adultery charged in the bill and after the commencement of the husband's suit, and after the service upon his wife of process, and before decree, the husband returned to the wife and cohabited with her, and led her to believe that he had abandoned the suit, thus bringing the case within the principle of *Clayton* v. *Clayton, 59 N. J. Eq. (14 Dick.) 310.*

*Second.* That at the time the suit of the husband against the wife was commenced and carried on, and at the time the decree was signed, neither the complainant nor the defendant therein were residents or citizens of the State of New Jersey, and that the complainant herein did not appear in said suit, was not served with process in the State of New Jersey, but was proceeded against as an absent defendant and did not appear, and that the defendant herein imposed and practiced a fraud upon this court in swearing that he was a resident of New Jersey, and that for that reason the said decree is absolutely void for want of jurisdiction in this court over the person of the complainant herein.

What may be termed the admitted, or at least incontestable, facts in the case, are as follows:

Complainant and defendant were married in the city of Trenton, in November, 1889, and the parties lived there together until on or about the 1st of December, 1895.

Four children were born to complainant during that time, the youngest in the month of April, 1895. Of these, two have died.

The youngest was disowned by the defendant, and, according to his own account, he had good and sufficient reason to believe, at the time it was born, that he was not its father, and, as he swears, the complainant herein so admitted. Nevertheless, he continued to cohabit with her as his wife from that time forward, until about the 1st of December of the same year.

He was and had been engaged in the business of a local expressman, but met with financial disaster in the fall of that year and his property was seized by the sheriff on a foreign attachment and his business entirely broken up.

There is no evidence to show that he ever had the least business of any permanent character in Trenton after that time.

On or about the day last mentioned (December 1st, 1895) he packed all his furniture and sent it to his wife in the city of New York. He also gathered out of his means $500 and sent it to her. She rented a flat in One Hundred and Thirty-fourth street, New York City, and established herself therein with her children and lived there, without her husband, until some time in January, 1896. About the first of that month, according to the husband's account, and toward the last of the month, according to the account of one Vogler, his witness in the former suit, he and that witness went together to his wife's flat in New York City, at night, and found Rebholz, her paramour, in the house, in her apartments; he had, manifestly, just left her bed. Defendant charged his wife with adultery with Rebholz, and she admitted it, so he swears.

Notwithstanding that he knew that Rebholz was the father of the youngest child, and that he had then and there caught him almost in the act of adultery with his wife, he at once resumed cohabitation with her, and lived with her as her husband until the latter part of the month of May, 1896, when he, as he swears, obtained possession of a large number of letters written by Rebholz to his wife, and all dated, as I read the record, in the year 1894. The letters, I must presume—I declined to read them—tend strongly to show the improper relations which had existed between Rebholz and defendant's wife. He then left his wife and went to Trenton and instituted the suit in question, wherein the bill was filed on June 13th, 1896.

The ordinary proceedings were had against the wife and order of publication against her, as an absent defendant, was made returnable on August 31st, 1896. The affidavit of the solicitor, Mr. Bainbridge, is that he handed a copy of the usual printed notice to the complainant on the 9th day of July, at her place of abode, 976 East One Hundred and Thirty-fourth street, New York City. No other service was made upon her.

After his first visit to Trenton to institute these proceedings,

the husband, as he swears, went back to his abode in New York and packed up his personal belongings, trunk, &c., and moved to Trenton. His father and mother lived in Philadelphia.

He stopped in the city of Trenton for a few days, and then, about the 1st or 4th of July, went out into Hunterdon county and stopped with two gentlemen by the name of Gary, who kept a little country store at a place called Reaville. He engaged in no business, so far as appears, unless it was, occasionally, to render them a little assistance about their store or about the premises or farm. He remained there until the last of September. His wife did not appear to the suit.

Order of reference was made to Master Aitkin, and the hearing came before him on the 9th day of October, on which day the husband was sworn, and again on the 10th, on which day his father and the witness Vogler were sworn, and again on the 16th, on which day two other witnesses were sworn.

About the last of September, or the first of October, the wife moved from the flat in One Hundred and Thirty-fourth street to one in One Hundred and Thirty-eighth street, where she lived until she broke up housekeeping, the next January (1897).

The husband, according to his account, shortly after the taking of the testimony before the master, went to his father's house, in Philadelphia, and stayed there until Thanksgiving.

According to the wife's account, he came to New York and assisted her in moving from One Hundred and Thirty-fourth street to One Hundred and Thirty-eighth street and in arranging her furniture in the latter place, and lived with her as husband and wife until the day before Thanksgiving. According to both parties, he did not live with her in her apartments after that day.

According to her account, he lived with her as her husband in the month of July, 1897, for about a week, at her mother's flat in New York City, while her mother and some other members of her mother's family were absent at the seashore.

He swears that on Thanksgiving day of 1896, while he was stopping at his father's house in Philadelphia, he received a telegram from a firm engaged in business as private detectives

in New York City, asking him to come there immediately, and that he went and engaged in the work of a private detective as an employe of that firm; that he had his lodging and home in New York City for three years thereafter, and was all that time working there.

Although he swears that he spent the time between October 16th, 1896, and Thanksgiving of that year in Philadelphia, circumstances appear in the case tending to show that he was more or less during that time engaged in work as a private detective for the New York firm.

On this statement of the undisputed facts in the case it would seem that the husband had no residence or domicile in the State of New Jersey at the time he was carrying on his suit here for divorce. He certainly, for six months before the suit was brought, had abandoned his residence in New Jersey, and had no business or occupation here, and had been living for at least five months in the ordinary manner with his wife in the city of New York.

There is not a particle of evidence to warrant the idea that he came to the State of New Jersey in May, 1896, for any other purpose but to procure a divorce from his wife, and there is no evidence to indicate that he had the least intention to remain and make his home here. Everything in the case tends to show that he had the intention to return to New York City after he got his divorce. Whatever of residence he had in the State of New Jersey during the summer of 1896 was of the most temporary and ephemeral character. He had no business or employment here. The very recent case of *German Savings and Loan Society* v. *Dormitzer, 192 U. S. 125,* is directly in point. That case affirms the same case in *23 Wash. 132.* So much for the lack of jurisdiction in this court.

Counsel for defendant, in his written argument, complains that this matter of want of jurisdiction was not given prominence by the complainant either in her bill or on the hearing of the cause.

The bill distinctly charges that prior to and during the pendency of the former suit the defendant was residing in the State

of New York and alleges that circumstance as one of the grounds of fraud in procuring the divorce.

This was clearly understood by the able counsel for the defendant, for at the very outset of the production of his evidence he attempted to prove his client's residence in New Jersey before, during and after the suit, with the result above stated.

The next question is as to the condonation of the offence by cohabitation with his wife.

The master finds she was guilty of adultery in June, July, August and September, 1894, at Hunter's Point, New York state, which is the place where the husband swore his wife was stopping at the time the youngest child was begotten.

The master further finds her guilty of adultery with Rebholz in the months of May, June, July, August and September, 1895, at Trenton, which is the last summer they lived together in Trenton; and again on different days and different months of the years 1895 and 1896, until the filing of the bill of complaint, at No. 976 East One Hundred and Thirty-fourth street in the city of New York.

Now, there is not the least evidence in the case before the master in the former suit, except a general statement by the husband under oath, that the wife ever committed adultery with Rebholz after the time, in January, 1896, when the husband and his friend, Vogler, caught them, as previously stated, together in her flat in the city of New York, and that discovery was immediately followed by cohabitation between the parties hereto up to the last of May, 1896, and shortly before the petition was filed.

I shall state more in detail the evidence given by the husband before the master.

He swears that they lived together in Trenton until December 1st, 1895; that his wife "now [October 9th, 1896] resides in the city of New York with William G. Rebholz—they were living together there, and I suppose they are now; they lived at No. 976 East One Hundred and Thirty-fourth street." He swears that before she left Trenton he found that she had been intimate in their house with Rebholz; that he charged her with it and

"she left December 1st, 1895, and went to New York with Rebholz and has, as I understand, ever since lived with him in that place."

He further states in his evidence before the master, that his first suspicion arose from letters from Rebholz to her which he opened; that he spoke to his wife about the letters and that she denied it at first and afterwards admitted to her husband "that Rebholz had been to the house in Trenton when I was out of town and stayed there over night. * * * She said he was at the house first in May, 1895, and stayed all night—two nights at that time; and then again in August and September, and in December of 1894—Christmas." He swore that she admitted these different times to him. He says that she made these admissions in December, 1895.

He further states that, after she went to New York, he employed a detective officer and went with him to the house in East One Hundred and Thirty-fourth street, where his wife was living, and found Rebholz there. His wife said that he (Rebholz) was boarding with her at that time. His valise was in the room she occupied. She was not engaged in any business.

"I was there subsequently," he swears, "and she admitted that Rebholz was living there with her; this was in January (1896) last; I was with the detective; I went there to see if I could catch them together; he was there when I went in, and was present when my wife admitted that they were living together." He further says that when she left Trenton, in December, 1895, he told her to get out, and he gave her money and the furniture to leave at once. He sent her a certified check for $500. He further swears that in 1894 his wife boarded for three months, June, July and August and to the middle of September, at Hunter's Point, New York; that when she went away from their home in Trenton she had her monthly courses, and when she came back she was pregnant. He did not see her once during those three months and had no connection with her, and that letters passed between her and Rebholz during that time. That is the date of the letters offered in evidence. That one of her children, named Osborn, was born April 1st, 1895. "I claim

that the child is not mine; it looks like Rebholz." · Further he says, "I reside in the city of Trenton; I have lived here for the last fifteen years." It thus appears that he concealed from the master the fact that he left Trenton in the latter part of the year 1895 and took up his abode in the city of New York and had lived with his wife as her husband up to a few days before the bill was filed. And, as before remarked, the evidence before the master discloses no proof of any adulterous intercourse between the wife and Rebholz after the month of January, 1896; but, on the contrary, the husband's evidence given in this cause shows clearly that he lived with her up to that time. ·

In the light of these admitted facts it seems to me that the case shows that the husband imposed on the court not only in the matter of residence but also in the matter of swearing that Rebholz was still living with his wife in New York City and also in concealing the fact that he himself had been cohabiting with her up to nearly the first of June, 1896.

It is clear, from his own evidence, that he had full and complete knowledge of his wife's misconduct when he lived with her from January to June, 1896.

This, it seems to me, is sufficient to dispose of the case without considering the evidence of the subsequent cohabitation.

But as considerable evidence was adduced in support of the wife's contention in behalf of the condonation *pendente lite* I shall give the result of my consideration of it.

The husband asserts, and has corroborative proof, that he was spending the months of July, August and September with the brothers Gary in Hunterdon county. But he left there on one of the last days of September, and he says that between that time and the time of the hearing, the 9th of October, in the divorce case before the master, he was in the city of Trenton, living with the witness Vogler. ·                ·

There is no corroborative proof given of this last statement, and the exposure of his falsehood in his evidence before the master tends very much to weaken the force of his evidence here.

His wife swears, and about this there is no dispute, that about the last of September she moved from One Hundred and

Thirty-fourth street to One Hundred and Thirty-eighth street, New York City. She further swears that her husband came to New York and assisted her in moving, and from that time on, until the day before Thanksgiving, he cohabited with her in the ordinary way, being absent sometimes, but making his home with her.

This is denied by him, and he attempts to set up an *alibi*.

So far as the first week or two in October goes, he is not corroborated. His father, who was sworn before Master Aitkin, October 9th, testified before me that about a week afterwards, or the next week, his son came to Philadelphia, to his house, and stayed there almost continuously until Thanksgiving day, and his wife testified to the same effect; but both admit that he was away for a day or two at a time on one or more occasions, and neither of them gave any particular reason why they have, at this late day, so distinct a recollection of his continuous residence during that time.

But that evidence leaves an ample opportunity for him to have visited his wife for at least two weeks the first part of October, and afterwards again from time to time.

There is corroborating evidence of the wife's story. He was seen in her apartments by her mother and one or two of her sisters, and there is evidence in support of the statement of the wife that he assisted her in laying down her carpets in her new flat.

I have carefully examined the conflicting evidence of the witnesses in that respect. The wife is, clearly, not to be implicitly believed, although I think she intended to speak the truth. She was twice examined—once *de bene esse*, in New York, and then in open court before me. Her sisters and mother were rather reluctant witnesses and were careful to testify to nothing that they did not think was true.

Upon the whole, I think the clear weight of the evidence is in favor of the truth of the wife's story that her husband did cohabit with her pending the divorce proceeding.

He admits that he visited his wife's flat on several occasions during that period to see his boy, but he denies the sexual intercourse.

Now, it must be observed that at that time his wife had not put in any answer to the proceedings. He had made a strong and conclusive case before the master. He was entitled to a decree as soon as the practice of the court would permit, and there was little likelihood of his wife appearing against him at that late day to set up condonation. In fact, it does not appear that either of them was aware of the effect of his having sexual intercourse with her after suit brought; and his having such sexual intercourse is not incredible, when we consider that after he was fully satisfied that his wife had been unfaithful to him in the summer of 1894, and had borne him a bastard child in April, 1895, and had continued her adulterous intercourse during the summer, he continued to cohabit with her all the summer of that year; and after he had caught her *in flagrante delicto* with Rebholz, in January, 1896, he cohabited with her for nearly six months.

Then it appears, too, by the evidence of both parties, that nothing was said about the divorce proceedings between them during the fall of 1896, and he never said to her, in so many words, that he had obtained a decree of divorce. He did not serve a copy upon her. He permitted his oldest child, whose custody was awarded to him, to live with her until she was forced to break up housekeeping, in January, 1897, and, in fact, neither the wife nor her family ever had any direct information that the divorce had been granted, except what they learned through some sensational articles in the newspapers.

They all knew that the suit was commenced, and they all thought it strange, as they say, that he should come back and live with his wife after having sued her for divorce.

The wife says that she supposed, from his conduct, that he had abandoned the proceeding, and never knew, positively, that he had a divorce until some time after she heard he was married to another woman.

The fact that he stayed with her for several days at her mother's house, in the summer of 1897, seems to me to be established by the clear weight of the evidence.

If she had known at that time that she was divorced, and had voluntarily cohabited with him under those circumstances, it could have had no effect upon the validity of the decree; but it does somewhat support her allegation that she, at that time, supposed the divorce proceedings had been abandoned.

I think, then, that the complainant has made out her case on both grounds, and it remains to inquire how far her right to relief is affected by the delay which occurred between the time of the procuration of the divorce and the filing of the bill.

It is a well-proven fact that she became very poor.

In order to live at all, she put a chattel mortgage on her furniture, which was soon swept away, and she has been living from hand to mouth ever since.

She has the youngest child to support; her parents are poor. She is not either an intelligent or efficient woman. She says that she did not know, until she heard her husband was married, that he had got a divorce; she did not know that she had any remedy; she did not know that anything could be done.

Her attention was first called to it in this wise: A judgment had been recovered against her, and, I believe, her husband jointly, in New York City, for medical services. She had been quite ill in the summer and fall of 1896. She was brought before a referee on supplementary proceedings, based on that judgment, by Mr. Tyndall, one of her counsel herein, and on that examination Mr. Tyndall learned some of the facts which have developed in this cause. He volunteered to inquire into the matter and consulted Mr. Steen, the other counsel.

Mr. Steen looked into it and presented to me, on November 5th, 1900, a petition for an order opening the decree.

I called his attention to the case of *Clayton* v. *Clayton,* pointed out the proper practice, and later on (November 22d, 1900), after an order for leave to sue *in forma pauperis* had been granted, the bill was filed.

That was nearly four years after the decree was signed.

A good deal of that time is accounted for by what I believe to be the truthful statement of the wife that she was not aware that the decree had been granted, and, in the next place, she

was entirely ignorant of her remedy under the circumstances and too poor to employ counsel.

In *Clayton* v. *Clayton,* I suggested that the time for filing a bill of review would endure at least three years, the time limited for taking an appeal. But counsel were unable to find any authority for any such limit. And then it must be observed that the decree in *Clayton* v. *Clayton* was based on a jurisdiction arising out of the clear residence of both parties in New Jersey, and upon a hearing in which the defendant appeared and had an opportunity to make her defence, and the only ground of review was adultery, committed between the time of the hearing and the decision by the judge that the acts of adultery against the wife were made out and before decree signed. That was a case where the wife had the absolute power to waive the condonation, and it might be held that a positive duty rested upon her to move promptly if she intended so to do. She was excused for whatever of delay occurred on the ground of her extreme ignorance and poverty.

There is no proof here that the wife had any notice beforehand that her husband contemplated another marriage, so there is no reason to charge her with keeping silent while she was conscious that he was about to take another wife.

But without determining how far the delay might prove fatal if the case rested merely upon condonation by the husband of the offence by the wife after suit brought and service on the defendant in this state, as in the *Clayton Case,* I am unable to see how any delay on her part can, upon any known principle, affect her right to a declaration by this court that the decree was invalid and void *ab initio* by reason of the lack of jurisdiction in this court to proceed in the cause.

It is to be observed that where there is a lack of jurisdiction by reason of a want of residential domicile on the part of both parties combined with extraterritorial service, and the absence of any formal appearance by the defendant, it must follow that the decree is absolutely void.

An action by way of bill to review it (like a suit by one of the parties to a marriage which is void by reason of one of them

having a lawful spouse in life) amounts merely to an action to obtain a judicial declaration of a condition that already exists.

The decree in the case of absolute disability to contract marriage is simply a declaration of nullity, as pointed out in *Rooney* v. *Rooney, 54 N. J. Eq. (9 Dick.) 231,* and in *G— v. G—, ante p. 30.* And the only object of the decree is to have that *status* judicially determined and established.

So here, an inherent lack of jurisdiction renders the decree void at all times and in all places and for all purposes, and a decree so declaring it does not vacate a valid decree, does not change the relation of the parties, but simply declares that the decree never was valid and that the relations of the parties have not been changed.

*Prima facie,* a court, however general its jurisdiction, has no power to acquire jurisdiction of a party defendant by service of process or notice outside its territorial limits. This is fundamental, and an ordinary judgment *in personam,* founded on such service of process, is absolutely void on its face to all intents and purposes, precisely as it would be if the record showed no service or appearance whatever. It is, indeed, no judgment whatever.

The single exception to this rule arises, and is everywhere recognized, where the court is dealing with some *"matter or thing"* within its territorial jurisdiction, in which case extraterritorial service is permitted of necessity. Such a *"matter or thing,"* it has been held, is the marriage state. If a spouse is a *bona fide* resident of the state, and the other spouse is absent, the court may acquire jurisdiction by extraterritorial service of process or notice.

This principle is fundamental, and it follows, and is entirely well settled, that all decrees of divorce, based upon extraterritorial service, without appearance, are on their face liable to have their validity attacked, on the ground that there was no *"res"* within the actual jurisdiction of the court to support them. The matter of the existence of a *res* within the jurisdiction is a matter which rests *in pais,* and it is well settled that an ad-

judication in the suit that the necessary *res* exists cannot avail. It is always open to question.

There are judicial utterances and a few authorities to the effect that where a court, exercising the jurisdiction, has determined that it has the jurisdiction, such determination is final and must be so accepted under the constitutional provision applicable to such cases. This proposition may be sound as to the question of jurisdiction of the subject-matter, but it cannot on any sound principle be maintained as to jurisdiction of the person, and whatever may have been thought or said on that subject in years gone by must now be considered as exploded.

The proposition goes to the length of holding that if the court shall, without actual service of process, either extraterritorial or infraterritorial, adjudicate that such service has been made, it is final. The proposition confutes itself on the simple principle that the party affected has either had no opportunity to contest it or was not obliged to contest it. The great weight of authority and reason is the other way.

The authorities on this subject are numerous. They are *Thompson* v. *Whitman, 18 Wall. 457; Price* v. *Ward, 25 N. J. Law (1 Dutch.) 225,* and other cases cited in *Elsasser* v. *Haines, 52 N. J. Law (23 Vr.)* at *p. 25; 1 Freem. Judg.* §§ *116–126; Bell* v. *Bell, 181 U. S. 175; Streitwolf* v. *Streitwolf, 181 U. S. 179.*

The highest court of this state has held that a *bona fide* domicile with residence in this state of one spouse is sufficient to maintain the jurisdiction of a divorce suit as against the absent spouse on extraterritorial service, although there has never been any matrimonial domicile. But it is to be observed that the supreme court of the United States, which is the final arbiter on this question, has never yet, so far as I am aware, held that anything short of a matrimonial domicile is sufficient to support the jurisdiction of the court based upon an extraterritorial service of process.

I have said that the United States supreme court is the final arbiter on questions of this kind, and it is worthy of remark that a judgment which is void by the rules laid down by the

supreme court of the United States is void, also, in the state whose court had rendered the judgment. See *Elsasser* v. *Haines, 52 N. J. Law (23 Vr.) 15, per Beasley, Chief-Justice.* He there says:

"Formerly a judgment entered in the way provided by the statute of a state was sometimes held to be enforceable in such state, even though the court officiating were not possessed at the time of jurisdiction over the person of the defendant according to the general principles of law and justice, as where such defendant was a non-resident and no process had been served upon him and no notice had been given except by way of public advertisement, at the same time it being conceded that such judgment would not be recognized extraterritorially; but now, by force of the addition to the federal constitution just adverted to, such judgment would be of no legal avail, either at home or abroad. In *Pennoyer* v. *Neff, 95 U. S. 714,* it was conclusively settled that a sale of land under execution by force of a judgment obtained in a state court, in conformity with the local statute, against a non-resident, who was not served with process and who did not appear, was a void act, so that no title passed."

It is difficult to perceive how a decree for divorce which is absolutely void by reason of the want of jurisdiction of the person can be validated by any action or non-action of the party defendant, any more than can a marriage within the prohibited degrees. To hold that a defendant in such a·case can validate a void decree, is to permit parties to procure a divorce by agreement between them, which is contrary to first principles governing this subject.

It is perhaps possible that a female defendant against whom a void decree of the character just mentioned stands of record may be debarred by her conduct from having awarded to her affirmative relief against her husband, based on the fact that the decree is void. But, granting that her conduct may disentitle her to affirmative equitable relief or remedy, it cannot validate the decree.

It is suggested that such a *quasi* estoppel arises in this case in favor of the defendant herein, not on account of any merit

of his, but by reason of the fact that he has again married. But no act on the part of the complainant is shown upon which the second spouse acted in going through the ceremony of marriage with the defendant herein. There is no proof that the complainant herein had the least knowledge or notice that her husband was about to marry again. She is not even guilty of standing by in silence. She was not present at the marriage. In fact, the existence of the new relation with the second spouse was not set up as a defence or directly proven. It was only mentioned incidentally in the production of the evidence. The date of the marriage or the circumstances attending it were not given.

I think at this day, with the light of common knowledge on the subject of obtaining divorces, based on unsubstantial residence and extraterritorial service of process, that the wholesome rule should be and is that a person who proposes to intermarry with another who has been divorced, should be held to be bound to inquire fully into the decree of divorce, and when it is based upon extraterritorial service of process to inquire carefully into the necessary basic fact of domicile on the part of the complaining spouse and require strict proof on that subject.

That burthen imposes no greater hardship on the proposed new spouse than is imposed on every person who proposes to make a purchase of land. Many of our titles to land depend entirely upon facts not appearing upon the record—matters strictly *in pais,* into which the purchaser is bound to inquire—and it is no greater hardship to put the same sort of burden on the person proposing to marry a divorced person.

Counsel for defendant, in his argument, relies on two cases in New Jersey, namely, first, *Nichols* v. *Nichols, 25 N. J. Eq. (10 C. E. Gr.) 60.* That was an action by the wife against her husband for a divorce from the bond of matrimony on the ground of adultery, and for alimony. The defendant set up in defence a decree of divorce of a court in Indiana. The allegation against the validity of this decree was that the court had no jurisdiction, and that it was fraudulent.and void.

The fact was that the suit was commenced there by the husband and process served on the wife in Massachusetts, and she appeared to the suit by attorney. That fact was found by the court against the denial of the wife. The chancellor held the decree valid, although collusive. Whether such ruling will stand the test of more modern cases, like *McGowan* v. *McGowan, 57 N. J. Eq. (12 Dick.) 322*, and other cases of that sort, may well be doubted.

But the chancellor put it distinctly on the ground that the parties to a collusive divorce are bound thereby.

In that case the husband married again immediately after the divorce, and had a child, and the first wife, with full knowledge of that, rested without action for about ten years. The distinction between that case and this is that the divorce was held, in the first case, absolutely valid between the parties.

The next case is *Yorston* v. *Yorston, 32 N. J. Eq. (5 Stew.) 495.*

There the circumstances were somewhat similar to those in *Nichols* v. *Nichols*. The husband, before obtaining the divorce, made a provision for the support of his wife, and, after obtaining it, married again, with what amounted to a consent on her behalf, and continued to support her for several years, and the occasion of the present suit was that she feared he was going to withdraw the support which he had been giving her directly and indirectly.

The chancellor there stated, distinctly, that the bill of the former wife did not charge any lack of validity in the decree, and he says: "Had the complainant desired to attack the decree she might have done so in her bill as originally filed, or she might have amended her bill after answer so as to question the decree, but she did neither." And he held that her action amounted to connivance with the adultery which she charged and to condonation of it.

Several other cases cited by counsel for complainant sustain the view which I have hereinbefore taken.

The result is that I am of the opinion that the complainant

had no domicile or residence in the State of New Jersey at the time of the filing of the bill, which resulted in the decree herein attacked, or during the pendency of that suit; that the adultery on the part of the wife, the complainant herein, upon which the decree therein was based, had been thoroughly condoned by the husband; and the allegation of condonation pending that suit and before the decree therein, is sustained by the weight of the evidence; and that the complainant's delay in asserting her rights has not been such as to bar her from relief.

I will advise a decree accordingly.