MARGARET HOLLANDER, complainant-respondent,

*v.*

PHILIP HOLLANDER, defendant-appellant.

[Argued February 8th, 1945.   Decided May 22d, 1945.]

*Mr. Maurice C. Brigadier,* for the appellant.

*Mr. Harry Katz (Mr. Freeman Woodbridge,* of counsel), for the respondent.

The opinion of the court was delivered by

HEHER, J.

The appeal is from a decree adjudging "null and void, and of no force and effect in the State of New Jersey," for lack of jurisdiction of the subject-matter, a decree of divorce granted appellant in the Chancery Court of Crittenden County, in the State of Arkansas, on March 21st, 1938. The ground of the divorce was desertion during the month of August, 1934; and jurisdiction was rested upon a finding of residence in the State of Arkansas on the part of appellant for more than two months prior to the filing of the complaint in the divorce action, and for more than three months preceding the granting of the decree of divorce, and "service of process by publication of Warning Order."

The facts and circumstances are revealed by *ex parte* affidavits submitted by the parties in a suit for separate maintenance instituted by the respondent in the Court of Chancery of New Jersey on October 19th, 1935. The parties have stipulated that these affidavits be accepted on all issues raised herein in lieu of "oral testimony," a course of procedure which the advisory master said was "deemed proper since the relevant facts are not substantially in doubt."

While the Arkansas decree recites that the parties were married in January, 1934, and the desertion occurred in August of that year, the pleadings and *ex parte* proofs in the maintenance suit all state the marriage date as January 8th, 1935, and the time of the separation as August of the same year. The marriage was celebrated at Brod, Czechoslovakia, while appellant was on a visit to relatives there. The wife was a native of and was then domiciled in that country, while the husband for some years theretofore had been domiciled in South River, New Jersey. He returned to South River without his wife, but on the ensuing May 23d she arrived in this

country, pursuant to an understanding between them. He met her at the steamship pier and escorted her to the home of his sister in South River, where he then resided. He apparently repented of the marriage, for he maintains that it was never consummated (although respondent alleges in the bill herein that they indulged in sexual intercourse near the end of 1939, or early in 1940, when he first informed her that he had a foreign decree of divorce), and it is clear that at his insistence they separated in August, 1935, when he took her to New York City and left her at the home of a friend. He suggested that she remain there until she had become familiar with the English language. She was obliged to hire a room in that city, where she has lived ever since. He gave her meager support for a short time, and then discontinued it altogether. He admits, in his affidavit filed in the suit for maintenance, that he had "urged her to do something whereby she would have a better opportunity to learn the English language and to equip herself so that she might be able to later keep house for herself" and him; that "his suggestion to her was that she go to New York City and obtain work, if possible, and he agreed to furnish her with such reasonable sums of money as he could in case her earnings would be insufficient to properly support her;" that he "called upon her in New York, and once she came to South River on a short visit;" that the marriage had not then been consummated, and "he felt that in so doing, his attitude was entirely honorable and more fair" to her "than if he had lived with her as husband and wife under the circumstances" and that "his entire attitude towards" her "has been friendly and with hopes that within the near future his regard for her would be increased to a point where if" she "was willing they could and should live together as husband and wife."

On January 13th, 1936, an order was entered in the maintenance suit directing appellant to pay his wife alimony at the rate of $10 per week, and a counsel fee and suit moneys. He failed to comply with these directions. Meanwhile, respondent had repeatedly endeavored, without success, to terminate the separation. Contempt proceedings were instituted on May 6th, 1937, but an order to show cause made on that

day and an *alias* order on the ensuing May 13th each failed for want of service. The suggestion of a deliberate evasion of service is not altogether baseless, but this is not a determinative factor. An answer was filed to the bill of complaint, but there was no replication nor any further proceedings to bring on the cause for final hearing. However, respondent continued her efforts to induce appellant to cohabit with her, or, failing that, to provide her with support. On June 30th, 1942, she interposed a petition in the maintenance suit alleging noncompliance with the interim order, and also that appellant had on April 27th, 1942, "married one Matilda Ghidalia," and that respondent and appellant had not been divorced. She prayed that appellant be adjudged in contempt for nonobservance of the order for alimony, and also that it be decreed that he was "guilty of bigamy," and that his "marriage" to Ghidalia is "unlawful, null and void, and of no effect." An order to show cause made on the filing of the petition also failed for want of service; and on the following July 31st, an *alias* order was entered commanding appellant to show cause "why he should not be adjudged guilty of contempt" and "punished accordingly, and for such other and further relief as may be just." Due service was made upon appellant; and, in answering affidavits, he set up the Arkansas divorce, and affirmed its validity, and asserted that in April, 1938, he advised respondent, in a conversation held on a street corner in New York City, of the entry of the decree of divorce, and she replied "she would not recognize that divorce decree because there had been no Jewish divorce," and that, "according to her religious belief, a divorce decree granted by a civil court did not have any value;" that on "numerous occasions" thereafter, she conveyed to him, through an intermediary, her desire for "a Jewish divorce," and that a meeting was finally arranged, in the course of which she "made demands for the settlement upon her of substantial sums of money," as a condition to the "granting of the Jewish divorce;" that in September, 1939, in a proceeding before a rabbi initiated at her request, and in which she was represented by proxy, a divorce according to Jewish law was granted, but that "several months" thereafter, she repeated

her demand for "a settlement of a sum of money upon her," and, when appellant invoked the Arkansas decree, she maintained that it was invalid; that during the period beginning in July, 1940, and ending in May, 1941, while appellant was incarcerated in the Hudson County penitentiary under sentence on a conviction of crime, respondent visited him on "numerous occasions," and, insisting that the civil decree of divorce was invalid, demanded a "settlement," and that this demand was reiterated between May, 1941, and the following September.

Respondent's affidavit in reply set forth that the nonprosecution of the maintenance suit was due to her own lack of means and appellant's failure to obey the order for the payment of alimony, counsel fee and suit moneys; that she received no notice of the pendency of the suit for divorce in Arkansas, and did not learn of the action and of the entry of the decree of divorce therein until April, 1940, at a hearing in a Domestic Relations Court of the City of New York on a nonsupport complaint made by her, although appellant had advised her shortly before the end of 1939, or early in 1940, that he had a foreign decree of divorce, without identifying the jurisdiction; that she had never sought "a Jewish divorce," and had not invoked rabbinical authority to that end, and was not represented by proxy in the proceeding in which a divorce under Jewish ritual was awarded, and was unaware of that proceeding until sometime thereafter, when she protested the action to the rabbi; and that this action was initiated by members of her family on religious grounds, without her knowledge or consent. In this, she was corroborated by her brother, who said the promptings of their parents in Czechoslovakia had moved him to take that step. Respondent denied the street-corner meeting with appellant in New York City, and also that she informed him she could not recognize the Arkansas decree until a divorce according to Jewish ritual had been granted. She insisted that all her efforts, directly and indirectly through relatives and friends, were addressed to the termination of the separation and, failing that, the provision of support. Indeed, she asserted that the situation was the reverse of that related by her hus-

band. She told of his urgings that she institute a civil suit for divorce in New York or elsewhere, in consideration of a "financial settlement," although he finally took the position that, having a rabbinical decree as well as a valid civil divorce, he was under no obligation to support her. She stated that while he was in the penitentiary, he entreated her not to take proceedings against him during his confinement, either for divorce or for support, promising to "make amends" upon his release from custody.

There was a counter-motion by appellant to dismiss the bill and to vacate the order for alimony, &c., for respondent's failure to file a replication to the answer and for failure of substantial prosecution of the suit for more than a year. The bill was dismissed, and the order for alimony, and the orders to show cause in contempt, were vacated. The decree, advised by Advisory Master Van Winkle, specifically grounded this judicial action upon the nonprosecution of the cause for more than a year, although the decree also recited the granting of the foreign divorce, and that "no proceeding is pending to set aside that decree of divorce on any ground," and "being valid on its face," it "is entitled to receive full faith and credit in this state," and, "by reason thereof," the parties "are now not husband and wife," and that, "at the request of the complainant, the defendant has obtained a Jewish divorce against her," and "the defendant has remarried." In his memorandum, the advisory master suggested that the fact that the marriage was childless "is to be considered in connection with the equities of the situation," and that the order for alimony should be vacated because "the subpœna was not served until after the order * * * was taken," and so there was no suit "pending" at the time the order was entered. We have no occasion to consider these conclusions, and express no opinion as to their soundness. There was no appeal from the decree of dismissal, &c., but it was followed by the instant suit. This decree was entered on December 24th, 1942; the bill herein was filed on July 19th, 1943.

The first insistence is that respondent is estopped "by her laches and her conduct" from assailing the validity of the Arkansas decree, and "from now asserting that she is still the lawful wife" of the appellant.

More specifically, it is said that since respondent knew of the Arkansas decree in April, 1940, and also that appellant had obtained a rabbinical divorce "at her request," and that respondent "had been informed" of appellant's "intention to remarry in March, 1942," and "knew" that appellant had remarried on April 27th, 1942, and that Advisory Master Van Winkle had concluded that "the Arkansas decree was entitled to full faith and credit in New Jersey," and therefore appellant and she "were no longer husband and wife," and her maintenance suit had been dismissed accordingly, respondent's "failure to institute any action to nullify the Arkansas decree until July 19th, 1943," disentitles her to the relief now sought under the authority of the case of *Sleeper* v. *Sleeper, 129 N. J. Eq. 94*. The point is not well taken.

The matrimonial domicile was not in Arkansas. Neither party was domiciled in that state. Appellant's residence there was purely temporary. He had no intention of establishing his domicile there. The *animus manendi* was lacking; indeed, the *animus revertendi* is evident. He returned to his home in South River shortly after the Arkansas decree was entered, and has had his domicile there ever since. His residence in Arkansas was but an ostensible and feigned compliance with that state's statutory prerequisite to the exercise of its divorce jurisdiction, designed to give the color of justification to the invocation of such jurisdiction; and, the domicile there being sham and fraudulent, there was on well-settled principles no jurisdiction of the subject-matter of the divorce action, and the decree granted therein has no force or effect whatever in this state. The purported residence was plainly a fraud upon the law of Arkansas; and, there being for that reason a complete absence of jurisdiction, the full faith and credit clause of the Federal Constitution (*article IV, section I*) is not applicable. *R. S. 2:50–35. Vide Mascola* v. *Mascola, 134 N. J. Eq. 48; Sprague* v. *Sprague, 131 N. J. Eq. 104; Bell* v. *Bell, 181 U. S. 175; 21 S. Ct. 551; 45 L. Ed. 804.*

In this, there is no variance from the principle of *Williams* v. *North Carolina, 317 U. S. 287; 63 S. Ct. 207; 87 L. Ed.*

*279.* The *ratio decidendi* of that case is that a state's decrees affecting the marital status of its domiciliaries are entitled to full faith and credit in sister states. It overruled the holding of *Haddock* v. *Haddock, 201 U. S. 562; 26 S. Ct. 525; 50 L. Ed. 867,* that the mere domicile within the state of one party to the marriage is not enough to confer jurisdiction to render a decree of divorce, enforceable extra-territorially under the full faith and credit clause, against the other nonresident party who did not enter an appearance and had only constructive notice of the pendency of the action, but there is seeming acceptance (although the question is reserved) of the doctrine therein expressed that since the power of adjudication derives from the state's concern in the marital status of persons domiciled within its borders, domicile of the plaintiff, immaterial to jurisdiction in a personal action, is essential to invest the court with jurisdiction which will entitle the divorce decree to extraterritorial effect, at least when the defendant has neither been personally served with process nor entered an appearance. The foundation for the exercise of state power in such matters is the relationship to the state arising out of domicile and the state's great interest in the institution of marriage and the marital status of its domiciliaries. In the *Williams Case,* North Carolina did not seek to invalidate the Nevada decree on the ground that neither spouse was domiciled in Nevada. As pointed out in *Mascola* v. *Mascola, supra,* it was conceded that the accused there were "actually domiciled" in Nevada. The sole issue was whether, conceding domicile in Nevada, jurisdiction to alter the marriage status was acquired by substituted service of process upon the nonresident parties to the marriages. The North Carolina Supreme Court held that it was not obliged to recognize the Nevada decree because personal jurisdiction of the nonresident parties was not acquired, even though each of the defendants had a *bona fide* domicile in Nevada. Thus it is that *Bell* v. *Bell, supra,* still controls in the exposition of the full faith and credit clause. The holding there is that "No valid divorce from the bond of matrimony can be decreed on constructive service by the courts of a state in which neither party is domiciled;" and that the recital "in

the proceedings" of the foreign state "of the facts necessary to show jurisdiction may be contradicted." One who merely pretends compliance with the jurisdictional prerequisites laid down by a sister state to secure a severance of the marriage tie cannot invoke the full faith and credit clause to reap the fruits of his fraud. The constitutional precept is not a shield for impostors. In such circumstances, the power of adjudication is absent. And it is here to be observed that generally that constitutional mandate is not applicable where the judgment was rendered by a court which lacked jurisdiction either of the subject-matter or of the person of the defendant. *Chicago Life Insurance Co.* v. *Cherry, 244 U. S. 25; 37 S. Ct. 492; 61 L. Ed. 966; Baker* v. *Baker, Eccles, & Co., 242 U. S. 394; 37 S. Ct. 152; 61 L. Ed. 386.*

Moreover, as the advisory master also found, appellant fraudulently suppressed knowledge of respondent's place of residence at the time of the institution of the Arkansas action, to the end and purpose of withholding from her notice of the pendency of the action and opportunity to be heard. He represented to the Arkansas court that respondent's residence was "New York City," although he well knew her street address at the time. True, he denies such knowledge, but this is incredible. And it is indisputable that he had the means of ascertaining precisely where she then lived. Thus, the requirements of procedural due process were not met. *Felt* v. *Felt, 59 N. J. Eq. 606; Atherton* v. *Atherton, 181 U. S. 172; 21 S. Ct. 544; 45 L. Ed. 803.*

If it be conceded *arguendo* that nonaction may infuse life into a void act, the element of laches is utterly lacking here. Appellant treated respondent with wanton cruelty. After a marriage in the land of her nativity, he brought her here, and then cast her adrift, leaving her to her own resources in a country of unfamiliar tongue, customs and jurisprudence; and now he seeks to charge her with laches because she did not promptly move for a judicial annulment of the result of his fraudulent act. He puts the *onus* of the attack upon her, and draws upon her inaction for the validation of the fraudulent device. This he cannot do. Considerations of public policy to one side, such a doctrine would run counter to the plainest principles of equity and justice.

We concur in the advisory master's finding that respondent was not aware of the rabbinical decree until after it had been granted. The evidence is clear that appellant withheld from respondent knowledge of the entry of the Arkansas decree as long as he was able to do so; and that, after she had been apprised of this, she persistently challenged the validity of the decree and vigorously asserted the continued binding force of her marriage to him. He remarried in the face of her reiterated insistence that she was still his wife, and that she intended to assert her rights as such. We agree with the advisory master that appellant is unworthy of belief. There are contradictions in his evidence here and in the Arkansas proceeding which cannot be reconciled with testimonial integrity.

The case of *Sleeper* v. *Sleeper, supra,* is not apropos. There, service of the summons in the foreign suit for divorce was made upon the defendant personally, and she thereupon journeyed to the foreign jurisdiction and interposed an answer and cross-complaint, which presupposed jurisdiction. The case was tried upon the merits; and there was a decree for the complainant husband. She later brought an action in the Court of Chancery of this state, based upon an allegation of fraudulent misrepresentation as to residence by the husband to the foreign jurisdiction, one that was not made in the suit there tried. While holding that the wife was guilty of laches, this court declared: "Whether or not the facts incident to, and the circumstances under which she entered into and vigorously conducted her defense in, the Nevada suit would, by themselves, bar the relief now sought is not determined; but those facts and circumstances, followed by her long inaction and the intervention of the new marriage contracted in good faith after a suitable waiting period, do, in our opinion, serve to place her in laches and to bar her from the relief prayed in her bill."

Next, it is contended that the decree of dismissal entered in the suit for maintenance is *res judicata* of the issues raised in this cause, in that it was therein adjudged that "the Arkansas decree is entitled to receive full faith and credit in this state and that" appellant and respondent "are now not husband and wife." This contention, too, is without substance.

The question of the validity of the Arkansas decree was not in fact determined in the contempt proceedings. The maintenance suit was dismissed under Chancery rules 203 and 286 upon the specific ground that respondent had "suffered her cause to lie without substantial prosecution for more than a year." And the recitals of the decree make it crystal clear that the validity of the foreign divorce was not before the court for consideration, and that it was considered that until the decree was invalidated in a direct proceeding, it was entitled to full faith and credit, *i. e.*, that it was not subject to collateral attack. The decree recites that "no proceeding is pending to set aside that decree of divorce on any ground." Respondent's assertion of the decree's invalidity was treated as surplusage. Thus, the doctrine of *res judicata* is inapplicable.

The case of *Kaufman* v. *Kaufman, 120 N. J. Eq. 603,* cited by appellant, is not to the contrary. There, more than three years after the entry of a final decree in a maintenance suit in the Court of Chancery of this state, the complainant presented a petition in the cause praying that the defendant be adjudged in contempt for noncompliance with the terms of the decree. In the meantime, he had procured a divorce in an undefended action in the State of Idaho; and he interposed this decree in defense. There, too, the defendant had contracted a second marriage. The advisory master concluded that the foreign decree contravened the statutory provision now incorporated in the Revision as *section R. S. 2:50–35;* and this court sustained the consequent decree. In overruling the contention that the foreign decree "should be attacked by bill, and not simply ignored in a petition supplemental to a decree for maintenance," this court said that such "is apparently the rule in a case where the suit for maintenance is pending"—citing *Fairchild* v. *Fairchild, 53 N. J. Eq. 678; Feickert* v. *Feickert, 98 N. J. Eq. 444.* The essence of the holding is that the decree in the maintenance suit "was final in its nature, and established the rights of the parties; and that it was for the husband to establish any change in that status, and not for the wife to show its persistence by instituting an attack on a proceeding in another state begun subsequent to the decree."

And the foregoing considerations are also dispositive of the point, lastly made, that respondent "failed to rebut the presumption that the Arkansas court had jurisdiction of the subject-matter and the parties."

Conceding that the presumption of jurisdiction of the subject-matter and of the parties is rebuttable if the foreign decree "is attacked upon the ground of fraud in the jurisdiction," the rule is invoked that such fraud must be established by clear and convincing evidence. As indicated, the evidence here satisfies that standard of proof. The fraud is transpicuous.

Decree affirmed.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, COLIE, WELLS, RAFFERTY, DILL, JJ. 11.

*For reversal*—None.