22 N.J. Super. 516 (1952)
92 A.2d 120
RUTH S. JUDKINS, PLAINTIFF,
v.
LE ROY E. JUDKINS, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided October 16, 1952.
*518 Mr. Purvis Brearley, attorney for plaintiff.
Mr. Howard K. Shaw, attorney for defendant.
GOLDMANN, J.S.C.
Plaintiff sues for divorce on the ground of adultery. The answer denies the charge and, by a separate counterclaim, defendant demands judgment declaring null and void: (1) the Arkansas divorce decree obtained by plaintiff on May 28, 1946 against her then husband, Richard Kain, and (2) the marriage between the parties solemnized July 14, 1946. Kain is still alive.
Plaintiff and Kain were married on April 22, 1944 and went to live in Baltimore. She returned to Trenton, N.J. when her husband, who was in the armed services, was transferred to Louisiana in January 1945. After serving overseas he returned to Trenton in March 1946, but plaintiff refused to live with him, stating that she was going to divorce him on the ground of desertion. There is no proof that Kain ever deserted her.
Plaintiff had been living in an apartment of her own in Trenton, but in February 1946 she moved in with her parents. *519 Defendant had been boarding with plaintiff's parents since the beginning of the year and was considered one of the family. He had his morning and evening meals with them and was often invited along when they went out for the evening. Family affairs were freely discussed in his presence, and foremost among the topics of discussion was the problem of plaintiff's marriage to Kain and its dissolution. The proofs are clear that defendant was present at these discussions and joined in some of them. He knew when plaintiff and her father went to see a Trenton attorney about arranging for an Arkansas divorce. He was present at the time Kain came to the house to accompany plaintiff's father to the attorney's office for the purpose of signing a waiver in connection with the contemplated proceedings. One of the questions discussed by the family in defendant's presence was how the expenses for the Arkansas trip and divorce were to be met, the final decision being that the father would get a finance company loan which plaintiff was to pay off.
Plaintiff finally obtained a leave of absence from her War Department position in Trenton and left for Arkansas with her father late in March 1946. She admits that her sole purpose in going was to obtain a divorce. The two arrived in West Memphis, Arkansas on March 26, 1946 and returned to Trenton in less than a week. Defendant was waiting for her at her parents' home, having taken the day off from work.
An exemplified copy of the Arkansas proceedings was introduced in evidence. The complaint was filed May 22, 1946 and alleges that the Kains separated at Trenton on March 19, 1945; that the parties had been separated for a period of more than one year next preceding the hearing, and that the desertion was willful and deliberate on the part of the defendant. It further states that plaintiff had been a resident of Arkansas for more than three months next preceding the hearing. The affidavit attached to the complaint indicates that it was executed May 22, 1946. However, the *520 plaintiff testified that she signed this affidavit a day or so after arriving in Arkansas  i.e., on March 27 or 28, 1946  at the direction of the attorney there.
The husband's entry of appearance and waiver of service filed in the Arkansas action was acknowledged at Trenton on March 15, 1946, more than a week before plaintiff entrained for Arkansas. (The date accords with the testimony about Kain having accompanied plaintiff's father on a visit to her Trenton attorney at that time.) By this instrument, defendant entered his general appearance "in the above-entitled cause for all purposes." There was, of course, no "cause" yet pending. He waived his right "to answer, demur or otherwise plead to the complaint of the plaintiff filed herein," agreeing "that said cause may be submitted to the court and disposed of by it upon the complaint of the plaintiff and such deposition as may be filed in support thereof."
The depositions of plaintiff, her father and her Arkansas landlady, were submitted in support of the complaint. The exemplified copy of the proceedings indicates they were taken on May 22, 1946 at the office of plaintiff's attorney. Neither plaintiff nor the father were in Arkansas on that date, having long since returned to Trenton. Plaintiff's deposition states that she and Kain separated at Trenton on March 19, 1945, the separation having been continuous since then; that the parties had been living at the home of plaintiff's parents and, defendant having said he "was very dissatisfied with married life in general," he packed and left; that the desertion was willful and deliberate on his part, and that plaintiff had lived in Arkansas since March 26, 1946. The landlady's deposition stated that plaintiff had lived in Arkansas since February 19, 1946, "a little more than three months now." The deposition of plaintiff's father gave the date of final separation as March 19, 1945, stating that defendant packed and left on that day. The father swore that his daughter had been living in Arkansas since March 26, 1946.
As already indicated, the depositions were allegedly sworn to in Arkansas on May 22, 1946. The decree of divorce is *521 dated May 28, 1946 and notes that plaintiff appeared by her attorney, defendant having filed his waiver of summons and entry of appearance, and that the matter was heard on petition and depositions.
The law of Arkansas in effect during 1946 was proved. Chapter 50, paragraph 4386, Civil Code, section 459, as amended by Act 71 of 1931, approved February 26, 1931; Pope's Digest of Statutes of Arkansas (1937), page 1271. It provided:
"The plaintiff, to obtain a divorce, must prove, but need not allege, in addition to a legal cause of divorce:
First: A residence in the State for three months next before the final judgment granting a divorce in the action and a residence for two months next before the commencement of the action.
Second: That the cause of divorce occurred or existed in this State, or if out of the State, that it was a legal cause of divorce in this State; the laws of this State to govern exclusively and independently of the laws of any other State to the cause of divorce.
Third: That the cause of divorce occurred or existed within five years next before the commencement of the suit."
It will thus be seen that in contravention of the statute plaintiff began her action less than two months after she came to Arkansas and obtained her divorce decree in much less than three months. She arrived and departed within a week. The divorce proceedings were based on depositions that were falsely post-dated, and on an entry of appearance and waiver of service executed prior to plaintiff's departure for Arkansas and more than two months before the complaint, which is referred to therein, was filed.
The entire proceedings were a fraud upon the courts of Arkansas and of this State. The divorce complaint alleged willful and deliberate desertion of one year's duration by the husband  not a valid ground for divorce under the laws of New Jersey. The matrimonial domicile was this State. Neither party was domiciled in Arkansas. Plaintiff's residence there was temporary; she did not even meet the very liberal statutory residence requirements of that jurisdiction.
The state of the law in Arkansas in 1946 was such that *522 mere residence might be considered as bestowing jurisdiction on the courts there for divorce purposes. Squire v. Squire, 186 Ark. 511, 54 S.W.2d 281 (Sup. Ct. 1932). The holding of the Squire case was considered a controversial one (Porter v. Porter, 209 Ark. 371, 195 S.W.2d 53 (Sup. Ct. 1945)), and was inferentially disregarded in subsequent cases. In 1947 Arkansas repudiated the view that mere residence for the statutory period was sufficient for divorce jurisdiction. Cassen v. Cassen, 211 Ark. 582, 201 S.W.2d 585 (Sup. Ct. 1947), expressly overruled Squire v. Squire insofar as it held that a person who came into Arkansas for the purpose of obtaining a divorce and did not have an animus manendi, might be said to be a bona fide resident of that State.
It may be noted that in Hollander v. Hollander, 137 N.J. Eq. 70, decided by the former Court of Errors and Appeals in 1945, the court dealt with Arkansas residence in terms of the principle adhered to in our State requiring domicile in the foreign jurisdiction. In that case defendant resisted complainant's efforts to obtain support by setting up an Arkansas divorce. The court said (at page 77):
"The matrimonial domicile was not in Arkansas. Neither party was domiciled in that state. Appellant's residence there was purely temporary. He had no intention of establishing his domicile there. The animus manendi was lacking; indeed, the animus revertendi is evident. He returned to his home in South River shortly after the Arkansas decree was entered, and has had his domicile there ever since. His residence in Arkansas was but an ostensible and feigned compliance with that state's statutory prerequisite to the exercise of its divorce jurisdiction, designed to give the color of justification to the invocation of such jurisdiction; and, the domicile there being sham and fraudulent, there was on well-settled principles no jurisdiction of the subject-matter of the divorce action, and the decree granted therein has no force or effect whatever in this state. The purported residence was plainly a fraud upon the law of Arkansas; and, there being for that reason a complete absence of jurisdiction, the full faith and credit clause of the Federal Constitution (article IV, section I) is not applicable. R.S. 2:50-35."
So here. Plaintiff never intended to establish a domicile in Arkansas. Her "residence" there was, in the language of *523 the Hollander case, nothing more than "an ostensible and feigned compliance with that state's statutory prerequisites to the exercise of its divorce jurisdiction, designed to give the color of justification to the invocation of such jurisdiction." Plaintiff's Arkansas domicile was sham and fraudulent.
Defendant's attack upon the validity of the Arkansas decree is immediately met by plaintiff's contention that he, being a stranger to the record of the Arkansas divorce proceedings and not having a property right affected thereby, is not legally entitled to question its validity. Before dealing with that contention, it is appropriate to consider the preliminary question of whether the decree may be questioned in the courts of New Jersey, absent the complicating factor of defendant's being a stranger to the Arkansas proceedings.
Directly involved is N.J.S. 2A:34-22 (formerly R.S. 2:50-35, as amended), whereby the Legislature defined the public policy of this State toward divorces obtained in a foreign jurisdiction:
"Full faith and credit shall be given in all courts of this state to a judgment of nullity of marriage or divorce by a court of competent jurisdiction in another state of the United States when the jurisdiction of such court was obtained in the manner and in substantial conformity with the conditions prescribed in sections 2A:34-9 to 2A:34-12 of this title Nothing herein contained shall be construed to limit the power of any court to give such effect to a judgment of nullity or divorce by a court of a foreign country as may be justified by the rules of international comity; provided, that if any inhabitant of this State shall go into another state or country, in order to obtain a judgment of divorce for a cause which occurred while the parties resided in this state, or for a cause which is not ground for divorce under the laws of this state, a judgment so obtained shall be of no force or effect in this state."
The present situation falls squarely within the terms of the proviso of the quoted statute. However, the declared policy of New Jersey must give way to the provisions of the Federal Constitution (Art. IV, sec. 1), that "Full Faith and Credit shall be given in each State to the public Acts, Records, and Judicial Proceedings of every other State," if the decree of *524 the sister state is of such quality as to entitle it to full faith and credit. If the court of the sister state had no jurisdiction, the decree is void and will not be recognized. Giresi v. Giresi, 137 N.J. Eq. 336 (E. & A. 1945).
The United States Supreme Court cases which govern the extent to which a divorce decree must be given effect in other states under the full faith and credit clause, and which are of immediate moment, are the two Williams v. North Carolina cases, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273 (1942) and 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366 (1945); Sherrer v. Sherrer, 334 U.S. 343, 68 S.Ct. 1087, 92 L.Ed. 1429, 1 A.L.R.2d 1355 (1948); Coe v. Coe, 334 U.S. 378, 68 S.Ct. 1094, 92 L.Ed. 1451, 1 A.L.R.2d 1376 (1948), and Davis v. Davis, 305 U.S. 32, 59 S.Ct. 3, 83 L.Ed. 26, 118 A.L.R. 1518 (1938).
While a divorce decree based upon a finding that one of the spouses was domiciled in the state granting the divorce must be given full faith and credit where such finding is not questioned in the sister state in which an issue as to its recognition arises (first Williams case), the mere fact that the court granting the divorce found that it had power to award the decree cannot foreclose re-examination by another state (second Williams case). Its courts are entitled to investigate the question whether the plaintiff had a bona fide domicile in the state in which the divorce was granted. Accord, Rice v. Rice, 336 U.S. 674, 69 S.Ct. 751, 93 L.Ed. 957 (1949). The foreign divorce decree may be impeached by showing that neither of the parties had acquired a bona fide domicile in the granting state, contrary to the findings of the courts of that state (second Williams case).
Regardless of the nature of the rights affected by a divorce, or of the local policy of a state in which the full faith and credit effect of a divorce decree of a sister state comes in issue, a decree based upon a finding of domicile and entered in a proceeding in which the defendant appeared and participated, is entitled to full faith and credit. It cannot *525 be impeached by the court of another state on the ground that the court had no jurisdiction for lack of one of the parties, unless it is so impeachable in the state in which the decree was granted. Sherrer v. Sherrer and Coe v. Coe, above. In each of these cases, the defendant spouse appeared personally and was represented by counsel; the Sherrer answer denied and the Coe answer admitted plaintiff's domicile, but the question of domicile was not actually tried in either instance.
The Davis case held, a fortiori, that a divorce decree based upon a finding of domicile made after actual contest and litigation of that issue, is entitled to full faith and credit and may not be subjected to collateral attack in any other state.
Here the former husband, Kain, cooperated with plaintiff in her plan to obtain a quick divorce by providing her with a signed appearance and waiver of service before she even started for Arkansas. By waiving his right to plead and consenting carte blanche to anything she might introduce by way of evidence, no matter how false, he gave up his right to contest jurisdiction. What he did, in effect, was to agree that the Arkansas courts had jurisdiction, and this long before the statutory residence requirements were met. The record is clear that plaintiff never met a single one of those requirements. Through her attorneys in this State and in Arkansas she, and her first husband in collusion with her, committed outright fraud upon the courts of Arkansas. She may not contend here that the executed appearance and waiver form so conveniently provided by her husband gives any support to the foreign decree. The language of Staedler v. Staedler, 6 N.J. 380, 390-391, 392 (1951), supplies the answer to any such contention:
"No matter what others may perceive to be the recent trend in the decisions of the United States Supreme Court in cases of this type, we are constrained not to impute to that court an intent that would reduce the solemn relationship of husband and wife to the status just adverted to or that that court will acquiesce in a fraudulent scheme *526 to use the principles of the Davis, Sherrer and Coe cases as a device to infuse constitutional virility into the judgment of a court of a sovereign state which has been deliberately deceived in proceeding to judgment in a cause over which in fact it had no jurisdiction.

* * * * * * * *
We are firmly of the opinion that the principles of the Sherrer and Coe cases, supra, only apply to a true adversary proceeding where the parties are represented by counsel of their independent choice and where there is an opportunity to make a voluntary decision on the question as to whether or not the case should be fully litigated either on the question of jurisdiction or the merits, and that once an election has been made by the defendant under such circumstances and conditions that then and then alone can the judgment of the court be res adjudicata and the full faith and credit clause operate for the advancement of justice rather than for the perpetration of a fraud." (Italics ours.)
May the defendant second husband collaterally attack the Arkansas divorce decree as invalid? He argues that he may, citing Meade v. Mueller, 139 N.J. Eq. 491 (Ch. 1947), and Tonti v. Chadwick, 1 N.J. 531 (1949). Meade v. Mueller was an action for specific performance of a contract to sell certain lands, brought by the seller against the purchaser. The defense was that the seller had no marketable title because there was an outstanding curtesy interest in her first husband from whom she had obtained a Nevada divorce through fraud on the jurisdiction. The vice-chancellor relied on Williams v. North Carolina (second case), 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) in recognizing the right of the defendant, a stranger to the Nevada decree, to challenge its validity. He quoted Mr. Justice Frank-furter:
"It is one thing to reopen an issue that has been settled after appropriate opportunity to present their contentions has been afforded to all who had an interest in its adjudication. This applies also to jurisdictional questions. After a contest these cannot be relitigated as between the parties. * * * But those not parties to a litigation ought not to be foreclosed by the interested actions of others; * * *." (Italics ours.)
The third party referred to by Mr. Justice Frankfurter was, of course, the State of North Carolina. It is well settled that *527 in criminal prosecutions, such as bigamy, adultery or fornication, the state has a right to impeach the validity of a foreign decree divorcing the defendant from a former spouse, where such decree is relied upon as a defense. Williams v. North Carolina, above; State v. Najjar, 1 N.J. Super. 208 (App. Div. 1949), affirmed 2 N.J. 208 (1949); State v. Nixon, 4 Terry 318, 43 Del. 318, 46 A.2d 874 (Ct. Gen. Sess. 1946); Lipham v. State, 68 Ga. App. 174, 22 S.E.2d 532 (Ct. App. 1942); State v. Wenzel, 185 La. 808, 171 So. 38 (Sup. Ct. 1936); People v. Dawell, 25 Mich. 247, 12 Am. Rep. 260 (Sup. Ct. 1872); State v. Herren, 175 N.C. 754, 94 S.E. 698 (Sup. Ct. 1917).
Meade v. Mueller concerned a property right. No such right is involved here  a factor which distinguishes the present case from others where property rights were asserted by strangers to a foreign divorce decree which they were permitted to attack collaterally. Moreover, the Nevada decree was held valid in the Meade case, the court finding that the Nevada court had jurisdiction of both the parties and the subject matter.
The italicized sentence quoted from the Williams opinion should be limited in its application to the situation there presented. The language is too broad to admit of unqualified application, as even a limited review of the cases will readily show.
Defendant argues that our Supreme Court applied the principle of the Williams case to a private third party in Tonti v. Chadwick. There the plaintiff sought a judgment annulling his marriage to defendant, one of the parties to a prior Mexican "mail order" decree. Relief was denied under the "unclean hands" doctrine. The question of plaintiff's right to impeach the validity of the Mexican decree because he was a stranger to the divorce proceedings was not raised, nor was it referred to in the opinion. Defendant cannot launch his attack against the Arkansas decree by reading into the Tonti case a principle that is not even mentioned by the court.
*528 In opposition to defendant's citation of the Meade and Tonti cases, plaintiff quotes from 27 C.J.S., Divorce, § 336:
"A stranger to the decree can only impeach it collaterally for fraud * * *. Within this rule, it has been held that one who subsequently marries one of the divorced parties has no such interest as will enable him to attack the decree." (citing Margulies v. Margulies, 109 N.J. Eq. 391 (Ch. 1931)).
and from 12 New Jersey Practice (Herr, Marriage, Divorce and Separation) (1950), sec. 1588:
"A stranger to the record in the foreign suit has been denied the right to attack the decree collaterally,"
which also cites the Margulies case. Both statements are over-simplifications of one of the most complex problems in divorce law.
In the Margulies case defendant resisted his wife's application for alimony pendente lite on the ground that she obtained a divorce from her first husband by fraud on the Virginia court which granted the decree, the fraud apparently being that through misrepresentation she induced that court to find the jurisdictional fact of domicile. The vice-chancellor noted, however, that if there were fraud it did not conclusively appear. He found that defendant had been aware of the fraud, if it existed, and helped pay the expenses of the divorce action. Defendant was denied the right to attack the Virginia divorce decree because he participated in the alleged fraud, and for the further reason that he was a stranger to the foreign suit. The Margulies case is not authority for the broad proposition for which it is so often cited.
If, as Mr. Justice Jackson said in his dissenting opinion in Rice v. Rice, 336 U.S. 674, 69 S.Ct. 751, 93 L.Ed. 957, "confusion now hath made his masterpiece" in the field of the extraterritorial effect to be given divorce decrees, then most certainly that confusion is at its greatest when we deal with the troublesome question of the standing *529 of a stranger to a foreign divorce proceeding to attack the validity of the divorce rendered therein. Decisional law presents a tangled web of conflicting principles and conclusions which compel analysts to adopt the unsatisfactory device of arranging the cases into rough categories. See, for example, the sequence of annotations: 109 A.L.R. 1026, 120 A.L.R. 815, 122 A.L.R. 1328, 140 A.L.R. 922, 153 A.L.R. 947, 175 A.L.R. 549 and 12 A.L.R.2d 717, as well as the many law review notes and articles collected in the Index to Legal Periodicals, among them 34 Mich. L. Rev. 959 (1936), 8 Univ. of Chicago L. Rev. 343 (1941), 27 Iowa L. Rev. 309 (1942), 16 Fordham L. Rev. 118 (1947), 61 Harvard L. Rev. 326 (1948), 6 Wash. and Lee L. Rev. 184 (1949), 17 Brooklyn L. Rev. 70, 340 (1950-51), 4 Univ. of Florida L. Rev. 217 (1951), 46 Ill. L. Rev. 307 (1951). The very frequency of these commentaries indicates that the problem will resist solution until the states all realize that the evils of the migratory divorce spring chiefly from the mandatory effect given them by the full faith and credit clause of the Federal Constitution. A possible practical solution lies in adopting a modified version of the proposals made by the National Congress on Uniform Divorce Laws of 1906. See, Herr, The Migratory Divorce and the Full Faith and Credit Clause, 21 Temple L. Quart. 357 (1948).
The confusion often found in textbooks and articles which deal with the question of the standing of a stranger to a divorce proceeding to attack the validity of the decree stems from a number of sources. The primary ones appear to be: (1) inexact evaluation of the cases, which sometimes fail to disclose whether the attack is rejected because the stranger has no standing to maintain it, or because the attack is not well-founded on the merits; (2) the fact that particular classes of strangers are sometimes not permitted to attack the divorce decree on grounds of public policy; and (3) courts sometimes do not agree as to what constitutes a direct and what a collateral attack.
*530 There are a number of cases which have sustained the right of a second spouse to attack a foreign divorce decree. Most of these will be found in New York where, it has been observed, a proceeding to annul a marriage "excels every other marital remedy in every State of the United States, not only in the greatest number and variety of grounds for terminating the marriage, but also in the surpassing ease and superior mode of proving such grounds." The court in Taylor v. Taylor, 181 Misc. 306, 47 N.Y.S.2d 401, 402 (Sup. Ct. 1943) observed:
"The strictures of the divorce laws of this state have caused many unhappy spouses to bring annulment actions as a way out of their troubles and the number of these cases is growing daily. For one with a sufficiently elastic conscience it is as easy to get an annulment in New York as a divorce anywhere in the United States."
Courts which permit a second spouse to attack a foreign divorce decree usually do so on the ground that the interest of the state is paramount. Adherence to this policy leads to extreme results. In Kiessenbeck v. Kiessenbeck, 145 Or. 82, 26 P.2d 58 (Sup. Ct. 1933) a wife sued her second husband for separate support and maintenance and he counterclaimed for annulment. The wife had been divorced from her first husband, a New York domiciliary, in Texas, although she had not acquired the requisite domicile in that state. The second husband had proposed marriage to her before the divorce, had suggested that she resort to the Nevada courts, and knew all the facts surrounding the Texas proceedings. The couple had lived together for 15 years and had a child of ten. The court denied relief to the wife but held the second husband entitled to an annulment despite the attendant circumstances, saying
"Ordinarily where parties are in pari delicto, a court of equity will not afford relief, but there are well-recognized exceptions to this general rule. In the instant case the interest of the state is paramount and, notwithstanding the laches involved and the fact that defendant was not the victim of any fraud, equity, even at this late *531 day, will, on the ground of public policy, terminate a social relationship polygamous in character."
In Simmons v. Simmons, 57 App. D.C. 216, 19 F.2d 690, 54 A.L.R. 75 (Ct. App. D.C. 1927), the wife sued for divorce on the ground of adultery, and the second husband filed a cross-action for annulment on the ground that her divorce from her first husband was obtained by fraud upon the Virginia court, both as to her residence in that state and the alleged ground of divorce. The second husband had furnished her the money necessary for the Virginia proceedings. It appears that the parties had been living together as husband and wife in the District of Columbia before she went to Virginia to get the divorce. Despite the presence of strong elements of estoppel, the court held that neither the principles of equity nor the integrity of the marriage relation were controlling, the interest of the state being involved. The rule of in pari delicto and the equitable doctrine of clean hands were held inapplicable.
Three years later the same court reached a similar conclusion in Frey v. Frey, 61 App. D.C. 232, 59 F.2d 1046 (Ct. App. D.C. 1932) on substantially the same facts. There the second husband devised the plan by which fraud was perpetrated on the Virginia courts. The Virginia divorce action was collusive, neither party being domiciled there. The second husband had lived with his present wife before she obtained her divorce. Following the Virginia divorce, the first husband remarried and had two children by that marriage. The court granted annulment on the second husband's cross-claim to the wife's suit for limited divorce and maintenance, on the authority of the Simmons case, despite the fact that the right of innocent third parties would be affected by the annulment of the second marriage. The court felt compelled to take the course it did because the Virginia divorce decree was a void one. Otherwise, it said, it would deny relief to both parties and "apply in their case that wise and salutary principle that the law estops a party to allege in a court of justice his own wrong."
*532 Other cases which permitted the second husband to attack the validity of the foreign divorce decree on the ground of the public interest in the marital status of citizens of the state involved, and despite the presence of factors which ordinarily would have estopped the second husband, are Christopher v. Christopher, 198 Ga. 361, 31 S.E.2d 818 (Sup. Ct. 1944); Jardine v. Jardine, 291 Ill. App. 152, 9 N.E.2d 645 (App. Ct. 1937); and Smith v. Smith, 72 Ohio App. 203, 50 N.E.2d 889 (Ct. App. 1943).
The Simmons and Frey cases were re-examined in Goodloe v. Hawk, 72 App. D.C. 287, 113 F.2d 753 (Ct. App. D.C. 1940), where the second husband instituted annulment proceedings attacking his wife's Virginia divorce from her first husband. By way of defense she claimed that he had asked her to obtain that divorce so that he could marry her, and paid for it. The parties married after the Virginia divorce and lived together for more than ten years. In the meantime the first husband had remarried and had several children by that marriage. The court held that under these circumstances the second husband "should be barred by the salutary principles of laches or estoppel" from challenging the Virginia court's finding that the wife was domiciled there at the time of her divorce. It cites with approval Kaufman v. Kaufman, 177 App. Div. 162, 163 N.Y.S. 566 (App. Div. 1917), "a case on all fours." It noted the holding of the Simmons case, which was "reluctantly followed" in the Frey case to the prejudice of innocent third parties, and said that it was proper to re-examine the rationale of those decisions. The court stated:
"We have recognized that the interest of the state in many situations may lie with recognition of such divorces [obtained in the foreign jurisdiction] and preservation of remarriages rather than a dubious attempt to resurrect the original. From a pragmatic viewpoint, judicial invalidation of irregular foreign divorces and attendant remarriages, years after both events, is a less than ineffective sanction against an institution whose charm lies in its immediate respectability. We think it may now be stated that the general public policy in this jurisdiction, as judicially interpreted, no longer prevents application in *533 annulment actions of the laches and estoppel doctrines in determining the effect to be given such divorce decrees. Doubtless there are [certain] circumstances wherein a particular public policy requires annulment of a marriage without regard to the guilt or innocence of the parties affected and many of the cases rejecting the laches or estoppel doctrines involve such situations. [Citing cases involving Mexican "mail order" divorces, marriages without benefit of any judicial divorce decree from the first spouse, and incestuous marriages.]"
The language used in deMarigny v. deMarigny, 43 So.2d 442 (Fla. Sup. Ct. 1949) is apposite. There the second wife sought a declaratory decree adjudging the divorce obtained from him by his first wife invalid. She had previously sought an annulment in New York, the state of her residence. The second wife contended that the state was an interested party and that the marriage should be set aside as void. Relief was denied, the Florida court saying (pages 446-447):
"The legal fiction of the State being an interested third party in a divorce suit had its genesis in morality, decency, `the welfare of society and the sanctity of the marriage relation.' When these worthy objectives have been accommodated the interest of the State is placed at rest. So we may well inquire whether in this case the State's interest in society's welfare should be investigated (regardless of the fact that the State is not actually, nor by judicial fiat theoretically, a party to these proceedings) and whether good morals, decency and indeed the sanctity of the marriage relation dictate or require an opinion favorable to the appellant-petitioner.
Assuming that the court should, in a sense, represent the State as an interested third party in a proceeding of this kind, it is our view that the interests of society, would be better served by an adoption of the lesser of two evils  non datur tertium. We mean that if the parties are left as the court found them an alleged fraud upon the court might thus appear to be sanctioned; yet, on the other hand, a judgment favorable to appellant-petitioner would amount to a judicial determination that both the appellant-petitioner and the appellee-respondent Alfred F. deMarigny had lived in a manifest state of adultery and would open wide an avenue for fraud (not to mention blackmail) of a character most difficult to discover. If the appellant-petitioner may maintain the instant suit it would be possible for any party to a fraudulent divorce decree, which is valid on the face of the record, to conspire with another person to enter into a marriage with him or her with the sole purpose in mind of having said spouse thereafter bring a proceeding to impeach the divorce decree and thus accomplish indirectly, by means of such conspiracy *534 and fraud, that which could not be accomplished directly. It is our conclusion that the lesser evil would result from a judgment unfavorable to the appellant-petitioner's position and that decency, good morals and the welfare of society would be more nearly satisfied by such ruling. Certainly, such a decision would be less inimicable to the interests of our citizens as a whole than one favorable to the appellant-petitioner for the latter, in our opinion, could lead to `widespread social disorder.' See Shea v. Shea, 270 App. Div. 527, 60 N.Y.S.2d 823, at page 827.
The decree of divorce which is under attack by the appellant-petitioner has not adversely affected the status or rights of the appellant-petitioner which existed at the time of the entry of said decree. Indeed, it has protected her (and such protection continues) in her after-acquired marital status for without it her relationship with deMarigny necessarily would have been classified as meretricious.
As aforestated, the appellant-petitioner was neither defrauded nor injured for she occupied no status and had no rights at the time of the entry of the divorce decree sought to be invalidated which were or could have been affected thereby. The law on this subject is as stated in Freeman on Judgments, Vol. 1, page 636, Section 319: `It must not, however, be understood that all strangers are entitled to impeach a judgment. It is only those strangers who, if the judgment were given full credit and effect would be prejudiced in regard to some pre-existing right, that are permitted to impeach the judgment. Being neither parties to the action, nor entitled to manage the cause, nor appeal from the judgment, they are by law allowed to impeach it whenever it is attempted to be enforced against them so as to affect rights or interests acquired prior to its rendition.'"
In Hall v. Hall, 139 App. Div. 120, 123 N.Y.S. 1056 (App. Div. 1910), the court denied the second husband the right to annul his marriage because the divorce obtained by his wife from her first husband in Colorado was void, having been obtained by publication of service on her first husband, a non-resident. The court held that the rule is that a stranger to a judgment can only impeach it collaterally for fraud when it injuriously affects him. The second husband knew that the wife was married when he met her; no fraud was committed against him; he wanted to marry her and knew that for him to do so she had to get a divorce. Although the first husband might avoid the Colorado divorce for fraud, he had not done so. The second husband could not void it for fraud because he was not injuriously affected by the *535 divorce. On the contrary, by virtue of it he obtained just what he then wanted.
There are elements present in the instant case which compel the conclusion that defendant-counterclaimant is estopped from challenging the validity of the Arkansas divorce obtained by the plaintiff wife. In the preliminary factual narrative it was pointed out that defendant was present at family conferences in which the contemplated divorce was discussed and the manner and means of obtaining it explored. He knew at first-hand, as a member of the household, that plaintiff and her father departed for and returned from Arkansas in about a week, during which the necessary steps were taken that eventually led to the divorce decree granted two months later. Defendant took a day off from work to await the return of his wife-to-be. He knew just when the divorce had been granted and married in reliance upon that divorce some 1 1/2 months later.
Defendant cannot now claim that he did not learn about the invalidity of the Arkansas divorce until the late summer or fall of 1951. As was said by Vice-Chancellor Pitney in Watkinson v. Watkinson, 67 N.J. Eq. 142, 157 (Ch. 1904):
"I think at this day, with the light of common knowledge on the subject of obtaining divorces based on unsubstantial residence and extraterritorial service of process, that the wholesome rule should be and is that a person who proposes to intermarry with another who has been divorced, should be held to be bound to inquire fully into the decree of divorce, and when it is based upon extraterritorial service of process to inquire carefully into the necessary basic fact of domicile on the part of the complaining spouse and require strict proof on that subject.
That burthen imposes no greater hardship on the proposed new spouse than is imposed on every person who proposes to make a purchase of land. Many of our titles to land depend entirely upon facts not appearing upon the record  matters strictly in pais, into which the purchaser is bound to inquire  and it is no greater hardship to put the same sort of burden on the person proposing to marry a divorced person."
The testimony reveals that a few years following the marriage defendant, upon his return home from work one evening, was shown a newspaper article by his mother-in-law reporting *536 an action brought by a first wife in which an Arkansas divorce decree was held void as having been obtained in fraud of the court. His only reaction to the family's concern was to tell them to stop worrying and forget about it. The language of Tonti v. Chadwick, 1 N.J. 531, 536 (1949) is appropriate to the situation:
"But petitioner had good reason to know that the decree of divorce was at least of questionable validity. Indeed, it seems reasonably clear that he had no abiding confidence in the legal integrity of the instrument. Inquiry would have disclosed that the decree was void; and it is but fair to presume that he refrained from inquiry because of the fear of unwelcome information. Be this as it may, the duty of inquiry was his. Watkinson v. Watkinson, 67 N.J. Eq. 142 (Ch. 1904)." (Italics ours.)
The language of Justice Wachenfeld, who joined in part of the opinion, is just as strong (at page 538):
"Where one with full knowledge of the factual situation goes through a marriage ceremony with a woman and cohabits with her for a period of time, he cannot thereafter obtain a decree of annulment on the basis that his spouse at the time of the ceremony was the lawful wife of another and at the time of her second marriage a divorce decree previously obtained was invalid. Keller v. Linsenmyer, 101 N.J. Eq. 664 (Ch. 1927). No one can successfully annul a marriage when entered into with knowledge that either party had a former spouse living. Ignorance of the essential facts is a prerequisite of relief. Tyll v. Keller, 94 N.J. Eq. 426 (E. & A. 1923); Smith v. Hrzich (Sup. Ct. 1948) 1 N.J. 1."
In Keller v. Linsenmyer, 101 N.J. Eq. 664 (Ch. 1927), a second husband sought an annulment on the ground that his wife's Florida divorce from her first husband was invalid by reason of fraud perpetrated upon the Florida court in representing that she had the necessary domicile. The petitioner was with the defendant when she left for Florida and again when she returned, and he fully knew of the divorce before he married her. The court refused to grant him an annulment, saying (at page 670):
"* * * The petitioner had ample time, between August, 1922 [when defendant left for Florida], and May 20th, 1923 [the date of their marriage], to have made investigation as to the legality of *537 said decree. * * * but he made no inquiry whatever in regard to the legality of said decree, or the circumstances under which same had been obtained. It was his duty, in my judgment, to make inquiry as to the legality of the decree of divorce which the defendant informed him she had obtained during her few months sojourn in Florida, prior to his marriage to her."
In denying a decree of annulment to the second husband, the court applied the equitable doctrine of clean hands.
Defendant now attempts to impeach the Arkansas divorce decree after having lived with plaintiff for more than five years, after she had borne him a son, and only after she charged him with having illicit relations with another woman. In the light of these facts and what has been said about his obligation to have inquired fully into the Arkansas divorce which she had to his knowledge so expeditiously obtained, he is estopped from now attempting to attack the foreign decree. He may not convert plaintiff's marriage to him into an adulterous, if not bigamous, relationship, and cast the shadow of possible illegality upon any marriage that the first husband may have entered into in the meantime. Were it not for the provisions of R.S. 9:15-2 he would, if allowed to impeach the Arkansas decree, also bastardize his issue.
Our courts have not hesitated to import into divorce and nullity suits, which are sui generis, maxims and rules commonly applied in equity suits. 12 New Jersey Practice (Herr, Marriage, Divorce and Separation) (1950), § 1589, p. 153. It has been observed that "When attack is made on a foreign decree of divorce, equity will accord or refuse its aid upon general equitable principles." Lawler v. Lawler, 2 N.J. Super. 79 (App. Div. 1949). Among the circumstances which may be material are unclean hands, laches, undue delay, or the generally inequitable conduct of the party seeking relief.
We have considered the recent case of Johnson v. Muelberger, 340 U.S. 581, 71 S.Ct. 474, 95 L.Ed. 552 (1951) holding that by virtue of the full faith and credit clause of the Federal Constitution, a state may not permit a collateral attack upon an out-of-state divorce decree by a stranger to *538 the divorce action, upon the ground of lack of jurisdiction, unless such an attack would have been permitted in the courts of the granting state. In that case Johnson, a widower with a child, married a second time. His second wife obtained a Florida divorce. Johnson entered a general appearance in the divorce proceedings but did not dispute the question of jurisdiction, although the matrimonial domicile had been in New York. After the divorce he married his third wife in New York. Thereafter Johnson died and left his estate to his daughter by the first marriage. The third wife claimed her statutory share in his estate, and the daughter attacked the Florida decree as invalid. In reversing the New York Court of Appeals (In re Johnson's Will, 301 N.Y. 13, 92 N.E.2d 44 (1950)), the Supreme Court held that for the daughter to succeed she must show that she would be permitted to attack the decree in Florida, even though her father and his second wife were precluded from such an attack there on the principle of res judicata. No Florida case so holding was cited, and so the New York Court of Appeals was reversed. Cf. Anonymous v. Anonymous, 85 A.2d 706 (Del. Super. Ct. 1951); and see 61 Yale L.J. 238 (1952).
Johnson v. Muelberger adds yet another refinement to the treatment of the subject of the extraterritorial effect to be given foreign decree of divorce, already considered by the United States Supreme Court in the two Williams v. North Carolina cases and the Sherrer and Coe cases, mentioned above. The Johnson doctrine was examined in its relation to these cases in Cook v. Cook, 342 U.S. 126, 72 S.Ct. 157, 96 L.Ed.  (1951).
No Arkansas case has been cited to establish that defendant could successfully attack the challenged decree in the Arkansas courts, nor has our own research brought any such case to light. A reading of recent Arkansas cases offers little clue to the decision which the courts of that state will ultimately reach in a case where a second spouse challenges the validity of an Arkansas decree in circumstances such as present themselves *539 here. We are therefore compelled to arrive at the result we have by applying the principles which have been followed in our forum and which are discussed above. Defendant cannot prevail on his counterclaim. We proceed to a consideration of the complaint.
Plaintiff charges that on different days in the months of June, July and August, 1951, defendant committed adultery with one, Marjorie Carter, at her home on Locust Avenue, Fallsington, Pa., and that on August 13, 1951 he committed adultery with her in an automobile parked in front of her home. The testimony fails to sustain the charges.
Plaintiff's suspicions were aroused when she found lipstick stains on defendant's apparel, a "starchy" spot on his trousers, a "starchy" handkerchief, and a contraceptive in his wallet. Plaintiff, her father and her brother then began to watch defendant's movements. They traced his truck to the home of the co-respondent. They found nothing more than defendant seated in the full-lit front room of the house, on a sofa or chair apart from Miss Carter. On one occasion they followed the defendant and the co-respondent to a tavern on the main road to Philadelphia, where the two stopped for half an hour, after which defendant took Miss Carter home. Plaintiff's father testified there were cabins some distance in back of the tavern, and he would have the court infer from this that the couple may have used one of the cabins for illicit purposes. There is not even a shred of evidence that the two entered or left any cabin, just as there is no evidence that they were seen in amorous dalliance by either the plaintiff or her father or brother.
Eventually plaintiff engaged a detective to trail her husband. He stationed himself near Miss Carter's home on several evenings. He saw defendant in the lighted front room of Miss Carter's house, stretched out on a sofa watching the television, with the co-respondent sitting in another part of the room. Aside from the fact that defendant stayed late and that Miss Carter's mother was not always present in the home, there is no proof of any wrongdoing.
*540 On the evening of August 13, 1951, the detective and his assistant drove to Locust Street, Fallsington, and put the Carter house under surveillance. They were seated in the front seat of their automobile, which was parked down the street at some distance from the house. From time to time they looked in upon the couple through the windows of the front room. They saw defendant and Miss Carter in the by-now familiar setting  seated in different parts of the room looking at the television. Toward midnight the two came out of the house and sat down in the front seat of a car parked in front on the same side of the street as the detective's automobile and pointed in its direction. The testimony of the detective is that he saw the heads and shoulders of the two through the front window of their car, silhouetted against a light shining through the back window. The heads disappeared from view and he saw a body moving up and down. He then put his car in motion, drove slowly past the parked car, stopped for an instant alongside the car and then drove away. In the split moment of stopping he says he saw Miss Carter reclining behind the wheel and defendant over her. She quickly tried to sit up, her blouse was disarranged, and there was a look of surprise on her face.
The testimony as to this incident is unbelievable. That Miss Carter and defendant sat down in the front seat of the car is not denied by either of them; the rest of the story they flatly deny. A detailed description and map of the street and its physical features contradict the detective's account. His car was at such a distance from the car under observation that he could not have seen much, if anything, of what went on in the front seat from where he was parked. It was night, and the street was heavily shaded by trees and shrubbery. The light which he says shone through the back window of the car was not close to the rear of the vehicle, as he testified, but was several hundred feet away, around a slight curve in the street. Finally, his story as to what he saw when he momentarily stopped beside the parked car is given the lie by his own assistant. The latter testified that *541 he had told his employer he could not join him in signing an investigation report which included the colorful account of the alleged movements of the suspected couple on the front seat, their position when the detective's car stopped alongside theirs, the condition of Miss Carter's blouse, or her surprised look. On the witness stand he contradicted his employer on all these points.
Defendant admitted that he had sought Miss Carter's company, and that he had kissed her on a couple of occasions. He had not told her he was married. He denied any wrongdoing at any time, either in an automobile, the Carter house or anywhere.
Miss Carter testified she had first met defendant at a quarry swimming hole; that she did not know he was married until the action was brought; that defendant had been in her company on a number of occasions but that aside from his kissing her once or twice there was no further relation between them, and certainly no intercourse; that she lived with her mother on Locust Avenue, and that she found defendant's company helped break the quiet and, it would appear, somewhat lonely life she led. All that the two of them ever did in the house was watch the television, and sometimes defendant would have a late-evening snack in the kitchen. Defendant was a help to the two women living alone in the house by tending to minor repairs and doing an occasional chore.
While neither defendant nor Miss Carter is entitled to the credit of fair and impartial witnesses, their testimony is not to be rejected on the assumption that they are guilty. In the absence of very clear evidence of their guilt, their evidence is to be fairly weighed and considered. The appearance, demeanor and manner of testifying of the alleged co-respondent were such as to indicate that she was telling the truth.
There is no direct evidence in the case of the commission of an act of adultery. Plaintiff seeks to establish the charge circumstantially, and this, under the well-recognized *542 rule, can only be done where two facts are established: (1) a criminal disposition or desire, referred to in our cases as "inclination," in the minds of both the defendant and the co-respondent, and (2) an opportunity to commit the same.
The leading case in this State on the establishment of adultery by circumstantial proof in a divorce action is Berckmans v. Berckmans, 16 N.J. Eq. 122 (Ch. 1863), affirmed 17 N.J. Eq. 453 (E. & A. 1864), in which the chancellor used the following oft-quoted language (at page 140):
"To establish the existence of adultery, the circumstances must be such as would lead the guarded discretion of a reasonable and just man to that conclusion. It must not be a rash and intemperate judgment, moving upon appearances that are equally capable of two interpretations. * * *
The facts proven must be such as cannot be reconciled with probability and the innocence of the parties. * * *
Mere imprudence, indiscretion or folly, is not conclusive evidence of guilt. The mind of the court must be satisfied that there was an intimacy between the parties, entirely inconsistent with the duty which a virtuous wife owes to herself and to her husband.
Guided by these principles, I do not feel warranted in pronouncing the defendant guilty of adultery. While there is much in her conduct to regret and censure as indiscreet and ill advised, I do not find in the evidence satisfactory proof of guilt. Where the conduct of a party admits of two interpretations, equally consistent with probability, the one involving guilt and the other consistent with innocence, the rule of evidence as well as the dictates of justice, require that the interpretation should be favorable to innocence."
And the opinion then stated this supplemental rule (at page 143):
"In order to prove adultery by circumstantial evidence, two points are to be ascertained and established; the opportunity for the crime, and the will to commit it. * * *"
The burden of proof is upon the plaintiff, and the proof must be clear and convincing in order to justify a finding that defendant was guilty of the adultery charged. Adultery may, of course, be proved by circumstantial evidence. *543 "The test is in the cogency of the circumstances. The proof must have sufficient probative force to support a legal inference as contrasted with a mere speculation." Eberhard v. Eberhard, 4 N.J. 535, 545 (1950).
The proofs do not meet the standards set by our cases. Taking the testimony of plaintiff and her father and brother at its strongest, it establishes nothing more than mere indiscretion on the part of defendant and raises in the legal mind nothing more than a suspicion of possible improper conduct. This is no substitute for the clear and positive proof required in adultery cases  proof permitting of no other conclusion than guilt. The court will not engage in speculation.
Testimony of hired detectives is always scrutinized with care, and should not be relied on unless corroborated. Sargent v. Sargent, 114 A. 428, 432 (Ch. 1920), affirmed 92 N.J. Eq. 703 (E. & A. 1921). The testimony of the detective in this case was entirely demolished on cross-examination. It was not even supported by the testimony of his assistant who squarely contradicted his story.
The complaint will be dismissed.
The custody of the child of the marriage, now three years old, will be awarded to the plaintiff.
Judgment for defendant on the complaint, and for the plaintiff on the counterclaim.